DOLORES WELDER ET AL. V. PATRICK LAMBERT, ADMR., ET AL.

No. 575.—Decided February 7, 1898.

**1. Community Property—Presumption—Spanish Law.**

Although, both under our statute and under the Spanish law, the presumption of community property arises from the naked fact that it was acquired during the marriage, yet when, upon an exhibition of the whole title, it appears that its origin preceded the marriage, and that it is the separate property of one of the spouses, that presumption no longer prevails. (Pp. 526, 527.)

**2. Same—Empresario—Contract Performed After Marriage.**

Power and Hewitson,. empresarios, under their colonization contract with the State of Coahuila and Texas, acquired the right to a grant of lands on compliance with the terms of such contract. Power, then single, after partial compliance, subsequently married, and the performance of the contract was completed and grant to the lands issued after such marriage. As between the heirs by this marriage and those by a subsequent marriage of Power, the land so acquired was his separate property,—the community estate of the first marriage being entitled, however, to reimbursement for the labor and expenditures in the performance of the contract during the existence of such marriage. (Pp. 516 to 527.)

**3. Same—Community Expenses on Husband's Property—Burden of Proof.**

In order for the heirs of the first wife to establish a charge upon such lands for a reimbursement of community funds expended in their acquisition, the burden was upon them to prove that the funds had been so expended. (P. 527.)

**4. Same—Reimbursement of Community—Partition—Stale Demand.**

Where such heirs of the first and of the second marriage had had common use and enjoyment of the property as tenants in common the demand of the heirs of the first marriage for reimbursement of the community for its funds expended in the acqui-

sition could be asserted at any time in a suit for partition. The matter was adjustable upon the final division of the property, and it was not necessary to assert the claim until partition was sought, and the doctrine of stale demand was not involved. (P. 527.)

QUESTIONS CERTIFIED from Court of Civil Appeals for Third District, in an appeal from Refugio County.

*Sam'l B. Dabney,* for appellants.—The solicitation of the colonial concession and the contract entered into by Power and Hewitson with the State of Coahuila and Texas, for the settlement of the colony, and the expense of obtaining the concession, formed no part of the consideration for the premium lands subsequently granted to the empresarios, but the sole consideration was the introduction of colonists. The concession vested the empresarios with the potentiality, only, of earning the land. Contract of Power and Hewitson, with the State of Coahuila and Texas; Colonization Laws of Coahuila and Texas; Pasch. Dig., arts. 559-562, 563, etc., especially art. 564, being art. 12 of the law, 1 Sayles' Early Laws, art. 47; Houston v. Perry, 2 Texas, 46; Maxey v. O'Connor, 23 Texas, 239.

The colonizatio concession did not confer an alienable property right upon the empresario Power, nor did it, prima facie, fix upon the premium grants made, and earned, at least in great part, after his marriage, the status of separate estate. A contract to purchase land, or the acquisition by contract of the potentiality to earn land by services, does not confer a right of alienation, or fix the status of the property. If alienation is permitted before the land is earned, it is of an estate to be created in the future, and not of a title then existing. Colonization Law of Coahuila and Texas; Pasch. Dig., art. 563, etc., especially arts. 574, 586, 588 and 589, or 1 Sayles' Early Laws, art. 47, etc., especially secs. 12, 24, 25, 26 and 27; Manchaca v. Field, 62 Texas, 135; Mills v. Brown, 69 Texas, 244.

The premium grant having been shown, according to the finding of the court, to have been made two years after the marriage of the empresario to Dolores de la Portilla, and also having been shown and found by the court to have been granted, in part, for a community consideration, and not having been shown to have been based upon any measurable consideration belonging to the separate estate of the empresario, the presumption is that the land belonged to the community estate of Jas. Power and his wife Dolores. (a) Because property acquired during marriage is presumed to have been acquired upon an onerous consideration, and to belong to the community. (b) Because, though it be admitted that the grant was made, in part, for a consideration belonging to the separate estate of the empresario, as well as upon a community consideration, if the proportionate amounts of the two considerations cannot be measured, the community will not be lost and merged in the separate estate, but the latter will be lost in the community. (c) Because the profits and proceeds of any expenditure of his

separate estate, made by the empresario during his marriage, belonged to the community.  (a)  On the community presumption and its strength.  Scott v. Maynard, Dallam, 550; Crow v. Fiddler, 3 Texas Civ. App., 576; Nixon v. Wichita Land and Cattle Co., 84 Texas, 410; Schmeltz v. Garey, 49 Texas, 60; Chapman v. Allen, 15 Texas, 283; Meyer v. Kinzer, 12 Cal., 247; Bryan v. Moore, 11 Martin, 26; 1 White's Recopilacion, 51 and notes; Schmidt's Civil Law of Spain and Mexico, art. 44, pp. 12-14 (reference not to Historical Outline but to subsequent paging); Ballinger on Community Property, pp. 35, 27; sec. 46, p. 80; sec. 66, p. 104; sec. 67, p. 106; sec. 161, p. 214.  (b)  On acquisition of property upon a consideration, part community and part separate estate, and confusion of interests and the presumption applicable thereto.  Morris v. Hastings, 70 Texas, 29; Jones v. Epperson, 69 Texas, 588; Epperson v. Jones, 65 Texas, 427; Smith v. Baily, 66 Texas, 555; Mitchell v. Mitchell, 80 Texas, 109; Clafflin v. Pfeiffer, 76 Texas, 469; Philopowski v. Spencer, 63 Texas, 609; Richardson v. Hutchings, 68 Texas, 89; Bank v. Ins. Co., 14 Otto, 54; Hart v. Ten Eyck, 2 Johns. Cha., 62; Ballinger on Community Property, secs. 44, 45, 46, 68; Storey's Equity Juris., sec. 468.  (c)  On investment of separate estate during marriage and the consequences thereof.  Scott v. Maynard, Dallam, 550; Parker v. Chance, 11 Texas, 513; McIntyre v. Chappell, 4 Texas, 198; Love v. Robertson, 7 Texas, 9; Dixon v. Sanderson, 72 Texas, 359; Schmidt's Civil Law of Spain and Mexico, sec. 44.

*Samuel B. Dabney* and *R. L. Batts*, for appellants, filed a motion for rehearing, in which they urged that the answer given to the first certified question was erroneous in the following particulars:

1.  Error in assuming that under the Spanish law everything which may have been called "bienes" would be looked upon as property, and considered as separate or community according to the time of its acquisition.

2.  Error in assuming that everything which might have been called an "accion" was "bienes" in the same sense in which that term was applied to the law of ganancial property.

3.  Error in considering: (a) A concession—a matter of grace—a revocable privilege as an "accion," as "bienes," as property in the sense of the law of ganancias.  (b) The concession to Power and Hewitson as a contract.

4.  Error in making the status of the property as separate or community depend upon the date of the initiatory steps taken in its acquisition rather than upon the date of its acquisition.

5.  Error in holding that, without reference to the time of acquisition of property, if the title thereto had its "origin" prior to the marriage the property is separate.

6.  Error in confounding the efficient cause,—the "causa," the essential thing fixing a property right,—with the origin or initiatory steps, and making rights to depend on the latter rather than the former.

7.   Error in holding that property in premium lands acquired by an empresario had its origin in the concession, in the mere privilege to introduce families, rather than in the introduction of families.

8.   Error in assuming that the fixing of the rights of property depended either upon the determination of when the title was initiated (that is, when the first steps were taken), or upon a determination of when the grant was made, since it is immaterial when the initiatory steps were taken and also immaterial (except as to the law of presumptions) when evidence of the acquisitions (final title) was given, the material inquiry being when the property was acquired.

9.   Error in denying that when property has been acquired during matrimony it is presumed to be community.

10.   Error in making the status of property as community or separate depend upon the initiatory steps taken in its acquisition rather than upon the character of the property or labor by or through which it was acquired.

11.   Error in violating a principle which has become a rule of property right in this State—the equitable and well established rule that property is separate or community as the consideration was separate or community, and that when part of the consideration was separate and part community the property is separate and community in the same proportion.

12.   Error in ignoring the fact that at least part of the "efficient cause," the "causa," by, through, or by reason of which the property in controversy was acquired belonged to or was of the community.

13.   Error in not recognizing the fact that even if the concession was an "accion," was "bienes," it was not the "bienes" which is in suit, but that at most it was property which, together with other property, belonging to the community, and other labor of the community has been invested in or "permuted" into the property in controversy, and which, therefore, in any event is at least community in part.

14.   The court erred in not applying the statutory presumption that property held by the husband or wife at the time of the dissolution of the marriage is community.

15.   The court erred in not applying the principle, that, when it has been established that a portion of the fund with which property was acquired was community property, the burden of proof is upon one undertaking to show a separate interest.

In an argument in support of the motion for rehearing (which cannot be intelligibly condensed in the space here permissible) counsel reviewed Spanish, French, and Louisiana authorities, with those of other "community" States upon the doctrine of "relation," and cited and discussed the following Texas cases:   Hawley v. Geer, 17 S. W. Rep., 914; Duncan v. Bickford, 83 Texas, 322; Martin v. Moran, 11 Texas Civ. App., 511; Bishop v. Lusk, 8 Texas Civ. App., 30; Smith v. Bailey, 66 Texas, 554; Yates v. Houston, 3 Texas, 455; Walters v. Jewett, 28 Texas, 201; Mills v. Brown, 69 Texas, 245; Medlenka v. Downing, 59 Texas,

37; Mitchell v. Marr, 26 Texas, 330; Watts v. Miller, 76 Texas, 16; McDougal v. Bradford, 80 Texas, 564; Porter v. Chronister, 58 Texas, 54; Hodge v. Donald, 55 Texas, 344; Wilkinson v. Wilkinson, 20 Texas, 242; Yates v. Houston, 3 Texas, 453; McIntyre v. Chappell, 4 Texas, 187; Cooke v. Bremond, 27 Texas, 459; Zorn v. Tarver, 45 Texas, 520; French v. Strumberg, 52 Texas, 109; McAlister v. Farley, 39 Texas, 552; Claiborne v. Tanner, 18 Texas, 78; Braden v. Gose, 57 Texas, 41; Brown v. Bacon, 63 Texas, 597; Love v. Robertson, 7 Texas, 6; Battle v. John, 49 Texas, 203; Cleveland v. Cole, 65 Texas, 402; Parker v. Coop, 60 Texas, 111; Dunham v. Chatham, 21 Texas, 231; Smith v. Boquet, 27 Texas, 507; Blum v. Light, 81 Texas, 420; Johnson v. Johnson, 23 S. W. Rep., 1022; Stringfellow v. Sorrells, 82 Texas, 277; Torrey v. Cameron, 73 Texas, 591; Rose v. Houston, 11 Texas, 163; Dixon v. Sanderson, 72 Texas, 362.

*Proctors* and *Glass, Callender & Carsner*, for appellees.—Although the grant to the land in controversy was extended after the marriage of James Power with appellant's ancestress, yet it issued pursuant to and by virtue of the right conferred by the colonization contract, made by said Power and his associate Hewitson with the Government of Coahuila and Texas, prior to such marriage, and consequently said grant assumes the same legal status of separate property, which was imposed upon said contract right.

The colonization contract conferred on Power and Hewitson an alienable property right. Pasch. Dig., arts. 574, 586, 589; Bissel v. Haynes, 9 Texas, 585. By analogy to concessions to Mexican citizens: Ryan v. Jackson, 11 Texas, 401; Clay v. Holbert, 14 Texas, 189; Fulton v. Duncan, 18 Texas, 37; Martin v. Parker, 26 Texas, 260. Being a right guaranteed by law was accordingly alienable: Johnson v. Newman, 43 Texas, 639; Herman v. Reynolds, 52 Texas, 395.

This alienable property right accruing to Power when he was a single man, fixes the legal status of the grant issued pursuant to such right, as Power's separate property. Manchaca v. Field, 62 Texas, 135; Porter v. Chronister, 58 Texas, 54; Wilkinson v. Wilkinson, 20 Texas, 244; Yates v. Houston, 3 Texas, 452.

If the fact that the grant to the land in controversy was extended by virtue of the contract right acquired by Power prior to his marriage, did not have the effect to absolutely impress upon such grant the legal characteristic of separate estate, still such fact was sufficient to rebut any community presumption arising from the mere extension of said grant after the marriage, and prima facie to constitute such grant separate property of James Power and impose upon appellants the burden of proving a community interest and its amount. Manchaca v. Field, 62 Texas, 135; Marlin v. Kosmyroski, 27 S. W. Rep., 1042.

Under the facts of this case there was no presumption that the grant in controversy was community property of the marriage of James Power with Dolores de la Portilla, or if such presumption ever obtained

it was destroyed by the evidence, and the court correctly held that the burden was on appellants to establish that there was a community interest, and the amount of such interest.

The evidence disclosing a sufficient reason why said grant was not earlier extended, to say that there was no officer authorized to do so, no presumption that said grant was community property arises from the mere fact that it was extended after the marriage.

If any community presumption ever obtained in this case, the issue being between the heirs of the husband and the heirs of the wife, whether the land in controversy was the separate estate of the husband or community estate of such husband and wife, this issue is determined like other issues, by a preponderance of the evidence, and any testimony reasonably satisfactory to the court is sufficient to destroy such community presumption. Mitchell v. Mitchell, 80 Texas, 101; Same case in 84 Texas, 306; Ballinger on Community Property, sec. 168.

The labors performed and expenses incurred in the procurement of the contract and its performance, are proper subjects of inquiry in determining the issue whether the consideration for said grant was separate or community property.

Whether we consider the introduction of the colonists, or the labors performed and expenses paid in their introduction, as the consideration for this grant, still in either event the evidence discloses that the major part of said consideration was performed prior to said marriage, and a comparatively small part after said marriage, and hence it follows that there is no presumption that said grant was community property. Medlenka v. Downing, 59 Texas, 37; Watts v. Miller, 76 Texas, 14; McDougal v. Bradford; 80 Texas, 564; Marlin v. Kosmyroski, 23 S. W. Rep., 1042; Love v. Robertson, 78 Texas, 6.

There being no presumption that said grant was community property, but the evidence merely disclosing that an interest therein might be community property, it therefore devolved upon appellants, as plaintiffs, to prove that there was such interest and its amount. Rev. Stats., art. 5250; Peterson v. Fowler, 73 Texas, 526.

The defense of stale demand was not eliminated from the law by the adoption of the Revised Statutes in 1879. Some of the decisions in cases, which were instituted since the adoption of such statutes, and which recognize the existence of such defense: Browning v. Pumphrey, 81 Texas, 167; Wilson v. Simpson, 80 Texas, 279; Howard v. Stubblefield, 79 Texas, 1; Hensee v. Kegans, 79 Texas, 347; Jolly v. Stallings, 78 Texas, 605; Frost v. Wolf, 77 Texas, 455; Robertson v. Dubose, 76 Texas, 1; Brown v. Roberts, 75 Texas, 103; Fuller v. Coddington, 74 Texas, 336; Chamberlin v. Boon, 74 Texas, 659; Montgomery v. Noyes, 73 Texas, 203; McCampbell v. Durst, 73 Texas, 410; Boone v. Miller, 73 Texas, 560; Bullock v. Smith, 72 Texas, 545; Tevis v. Armstrong, 71 Texas, 59; Land Co. v. Chisholm, 71 Texas, 524; Telfener v. Dillard, 70 Texas, 139; Harvey v. Cummings, 68 Texas, 599; Wilson v. Simpson, 68 Texas, 306; Land Co. v. Ward, 1

Texas Civ. App., 307; Golson v. Fielder, 2 Texas Civ. App., 400; Shortridge v. Allen, 2 Texas Civ. App., 197; Broussard v. Dull, 3 Texas Civ. App., 68; Southall v. Southall, 6 Texas Civ. App., 697; contra, dicta in Land Co. v. Hyland, 28 S. W. Rep., 206; Ranch Co. v. Waldstein, 28 S. W. Rep., 262; Storer v. Lane, 20 S. W. Rep., 852.

The community interest of Dolores Power sought to be recovered by appellants herein was an equitable estate. Kirby v. Moody, 84 Texas, 201; Stiles v. Japhet, 84 Texas, 97; Patty v. Middleton, 82 Texas, 591; Montgomery v. Noyes, 73 Texas, 208; Harvey v. Cummings, 68 Texas, 607; Edwards v. Brown, 68 Texas, 330; Wren v. Peel, 64 Texas, 380; Hill v. Moore, 62 Texas, 614; Walker v. Howard, 34 Texas, 515.

Although this community interest accrued to Dolores Power under the civil law, which knew no distinctions between legal and equitable titles as such, still her title was one held by her husband, the grantee, in trust for her, and upon the adoption of the common law, with its recognized forums of law and equity, it was only to the latter that she or her representatives could appeal for enforcement of such right, and hence the same became an equitable estate because recognized and enforced only in a court of equity. The definition of an equitable estate is one vested in another and only recognized in courts of equity. 1 Pomeroy's Eq. Juris., § 147; as applying same definition, Wilson v. Simpson, 68 Texas, 308; contradistinguished from definition of a legal title in, Patty v. Middleton, 82 Texas, 591; that these interests, held by the legal title in trust, are equitable, Carlisle v. Hart, 27 Texas, 350; McMasters v. Mills, 30 Texas, 592; Delk v. Punchard, 64 Texas, 364.

The allegations of said plea disclosing, that appellants' claim was based upon an equitable title and that the last disability excusing delay in institution of suit on such title had expired in 1854, while the suit was only brought in 1890, the demand by appellants was clearly stale. That such claim was stale after such lapse of time, Frost v. Wolf, 77 Texas, 462; Carlisle v. Hart, 27 Texas, 354; that even ten years delay is sufficient, Montgomery v. Noyes, 73 Texas, 203; McKin v. Williams, 48 Texas, 92; Fuller v. Coddington, 74 Texas, 338; that there is no tacking of disabilities, Howard v. Stubblefield, 79 Texas, 1; Land Co. v. Ward, 1 Texas Civ. App., 311.

*Proctors*, for appellees, also filed argument in the Supreme Court upon the questions certified.

GAINES, CHIEF JUSTICE.—In this case certain questions have been certified by the Court of Civil Appeals for the First Supreme Judicial District for our decision. The statement and questions are as follows:

"The appellants, Dolores Welder and others, brought the suit against the appellees, Pat Lambert and others, in form for the partition of a

part of 4½ leagues of land situated in Refugio County, on the west side of the San Antonio River, granted to the empresarios James Power and James Hewitson as premium lands for the introduction of colonists under a contract with the State of Coahuila and Texas. There had been a partition of the interests of Power and Hewitson, and the 4½ leagues above mentioned were set apart to Power. The contract for colonization was made June 11, 1828. The grant of the 4½ leagues was made October 12, 1834; and the other premium lands were granted in December, 1834. Power was twice married. In July, 1832, he married Dolores de la Portilla. By this marriage there were two children, the appellant, Dolores Welder, and a son James Power, who was the father of the other appellants. The appellants are the only heirs of Dolores, the first wife. She died in 1836. Afterwards James Power married Tomasa de la Portilla, a sister of the first wife, who bore him five children. James Power died in 1852 and Tomasa his second wife died in 1893. The appellees represent the entire interest of the five children by the second marriage. Appellants contend that the land was the community property of James Power and his first wife Dolores, and that they are entitled to one-half thereof in the right of their mother and to two-sevenths of the remaining one-half in their right as heirs of James Power, while appellees contend that the land was the separate property of James Power and that the appellants' are only entitled to two-sevenths of the whole.

"The contract of Power and Hewitson with the State of Coahuila and Texas was for a colony within the littoral leagues, and received the approbation of the Supreme Government. Article 1 refers to the approbation of the Supreme Government, and states that government admits the project so far as conformable to the law of April 24, 1824. It defines the limits of the colony, which was afterwards on March 13, 1829, augmented, and the colony was established in the augmentation limits. The remaining articles of the contract are as follows:

" 'Art. 2d. In view of the described territory the empresarios remain obligated to introduce and settle, on their own account, two hundred instead of four hundred familes which they offered, it being an express condition that one-half of this contract shall be Mexican families, and the rest alien families from Ireland.

" 'Art. 3rd. All possessions with corresponding titles found within the territory described in Art. 1st shall be respected by the colonist of this contract, the empresarios being charged with compliance with this obligation.

" 'Art. 4th. Whenever any land may be required as useful and advantageous owing to its locality and circumstances for the construction of some fortress, wharf or store for the defense of the port or establishment of public administration, the empresarios shall have no right to prevent the occupation of any land or interesting point that it may be advantageous to take for any of the indicated objects or any other not herein expressed.

" 'Art. 5th.   In conformity to the law of March 24, 1825, the empresarios remain obligated to introduce and settle the two hundred families mentioned in Art. 2d within the term of six years counted from this day, on penalty of forfeiting the rights and donations granted them by the same law.

" 'Art. 6th.   The families, besides being Catholic as the law requires, must be of good character, establishing these qualifications with certificates by the authorities of the country whence they came.

" 'Art. 7th.   It is an obligation of the empresarios not to introduce nor permit within their colony, criminals, vagrants, or men of bad conduct.   They shall cause all persons in such circumstances to leave their territory, and in case of resistance the armed force must be resorted to.

" 'Art. 8th.   To this end, whenever there shall be a sufficient number of men, the National Civic Militia shall be organized in full compliance with the law.

" 'Art. 9th.   Whenever they shall have introduced at least one hundred families, they shall notify the Government in order that it may send a Commissioner to give to the colonists possession of their lands and to establish towns in conformity to the law and to the instructions which he shall receive.'

" 'Art. 10th.   After the particular application of lands to colonists and of premiums to the empresarios shall have been made, the Government alone shall have the power to dispose of the lands remaining vacant.

" 'Art. 11th.   Official communications with the government or authorities in the State and all public instruments and deeds must be written in the Castilian languages.

" 'Art. 12th.   In all other cases not expressed in the articles of the present contract, the empresarios shall subject themselves to the general Constitution and laws and to the particular Constitution and laws of the State.

. " 'And his Excellency the Governor and the attorney, in the name of the empresarios, *having agreed to every one of the articles of the present covenant, obligated themselves reciprocally to punctual compliance herewith before me, the Secretary of State, and signed hereto for perpetuation.   And the original proceedings remaining archived, a Testimonio of the whole proceedings was ordered to be delivered in duplicates to the party interested for his protection, Leona Vicario, June 11th, 1828.—Jose Maria Viesca—Victor Blanco—Juan Antonio Padillo, Secretary.   This is a copy.   Santiago del Valle, Sec.'

"Dolores de la Portilla had no separate means when she married Power and did not receive anything from any source after her marriage.   The evidence shows that colonists were introduced both before and after the marriage, but it is uncertain how many were introduced before and how many were introduced after.   If the respective interests in the land are to be established by proof as to what proportion of the consideration for the grant was of the separate estate of Power and

what of the community estate of himself and his wife Dolores, the party having the burden of proof will be at great disadvantage on account of the uncertainty of the evidence.

"Appellees pleaded stale demand against the right of appellants to maintain their suit. The plea is substantially as follows: It alleged that plaintiffs claimed the land in controversy was community property of James Power and Dolores de la Portilla, and that they inherited from said Dolores her community interest; and then further stated, that the grant to James Power and James Hewitson of four and one-half leagues, embracing the land in controversy, and of five leagues in which Power relinquished his interest for that of Hewitson in said four and one-half leagues grant, were both made to James Power and James Hewitson as grantees, and invested them with the legal title, and the record and apparent title thereto, and in no manner disclose any trust or interest in favor of said Dolores. That said Dolores, wife of James Power, died intestate in about 1836 and prior to 1840, leaving surviving as her heirs at law the plaintiff Dolores Welder and a son, James Power, Jr. That the plaintiff, Dolores Welder, was born in 1835, married in 1850, and her husband died in 1876, and that continuously thereafter she had been a feme sole. That said son James Power, Jr., was born in 1833, and consequently became of age in 1854 and died intestate in 1886, leaving as his heirs at law the other plaintiffs, Mary F. Swift, Agnes E. Shelley and James Power. That neither Dolores Welder nor James Power were at any time subject to any other disability than those named. That from the time of the accrual of such r ight, if any, until the institution, on August 18, 1890, of this suit, neither said James Power, Jr., nor plaintiffs ever actively asserted any claim to any community interest of Dolores Power. That defendants claimed title to interests therein as though it were separate estate of James Power and as devisees and purchasers from devisees under his will. That while the land in controversy has been used by all parties to the suit, yet such use was entirely consistent with the interests as defendants assert them, and inconsistent with plaintiffs' claims, and that the right to the use and enjoyment therefor has been recognized and respected by all parties to this suit and their predecessors in estate to be as defendants contend, and the burdens incident to the ownership have been borne in the same proportions. That none of the defendants ever sanctioned, recognized or respected any such claim as now asserted to a community interest under Dolores Power. That if any such interest ever existed the delay by plaintiffs to institute this suit has resulted in the loss of evidence which would establish its amount, and that the evidence probably once obtainable to establish that there was no such interest can no longer be obtained. Accordingly defendants contend that plaintiffs' demand was stale.

"To this plea the appellants demurred as follows: 'And further that said plea, in so far as it attempts to set up a use of said lands by the parties plaintiff and defendant inconsistent with plaintiffs' demands and

consistent with the alleged claim of defendants, is insufficient in that it does not set up any facts as to such user as would tend to show such, and further because, in so far as by the allegations of said plea an equitable estoppel is attempted to be set up, it is insufficient in that it does not allege any facts constituting such estoppel, nor does it allege that any act of the plaintiffs was to the injury of the rights of defendants, or that by such act or acts they were lead by plaintiffs into a false position as to their rights, or that they were thereby in any manner misled by any such act or acts or were induced to act thereon to their injury. And further, in so far as this said plea undertakes to set up a plea of stale demand, same is insufficient in that it attempts to set up a plea not applicable to the case made by the pleadings.' The demurrer was sustained, because the court was of the opinion that there was no such defense as stale demand. There is a cross-assignment of error upon this ruling of the court.

"Upon the foregoing statement the opinion of the Supreme Court is requested upon the following questions:

"1. Did the fact that the grant to the land in controversy was made after the marriage of James Power and Dolores de la Portilla create the presumption that the land was the community property of the said James Power and his said wife Dolores?

"2. Upon an issue of fact as to how much of the consideration for the grant was of the separate estate of Power and how much was of the community estate of himself and his wife, on which party should the burden of proof rest?

"3. What efforts or expenditures of Power should be estimated in determining the extent of the separate and community interests in the land? Should his expenditures and labors in obtaining the contract be taken into the estimation?

"4. What was the character of the title inherited by the appellants from their mother? Was it legal or equitable?

"5. Does the doctrine of stale demand apply to the appellants' cause of action?

"6. Should the demurrer of appellees setting up stale demand against the appellants' cause of action have been sustained?"

Preliminary to answering the questions certified, we deem it expedient to determine what the respective interests of Power and his first wife were in the lands at the time the final title was extended. The Spanish law being at that time in force, the result of the inquiry must depend upon the principles of that system of jurisprudence. There are decisions of this court which bear upon the question, but there are none that we have found in which the precise point has been considered. The Spanish authors, having no precedents to guide them, are necessarily confined to the enunciation of general principles, which fall short of declaring the law as to the specific question before us.

We are of the opinion that the concession made to Power and Hewitson under the law of Coahuila and Texas of March 24, 1825, by which,

in consideration of their stipulating to introduce into the State a certain number of families, they were given the right to a premium in lands to be selected and granted to them upon their compliance with the agreement, has all the elements of a contract, and it seems to us that it is a matter of no moment whether the right so acquired was alienable or not. It was a fixed contract right, which entitled them to acquire the lands by a compliance with its conditions; and as we think was property under the Spanish law. Escriche in his dictionary treats of the respective rights of the husband and wife in the property held by them, under the words "Bienes Gananciales;" and he there says: "Among 'las bienes gananciales' are not considered: (1) Those which the consorts had at the time of contracting the marriage * * *." Escriche Dic. Leg., p. 367. In defining the meaning of the word "bienes," he uses this language: "Under the word 'bienes' are included also 'las acciones' of whatever kind they may be. 'Acque bonis adnumeratur quod est in actionibus, petitionibus, persecutionibus.'" Id. p. 362. The first class of "acciones" defined by the author cited are shares in a partnership or incorporated company. Id. p. 48. Then again, under a separate head, he defines the word "accion" as follows: "The right to demand anything; and the method of judicial procedure which we have for the recovery of that which is ours, or which another owes us. * * *. 'La accion' meant in the first sense, that is, such as a right which belongs to us to demand anything,—may be considered movable or immovable [that is—personal or real] by reason of its object, although it may be neither the one nor the other in its nature." Id. p. 49. The result is that all choses in action owned by either of the consorts before marriage, remain the separate property of such consort.

If contracts be property and if all property held by either the husband or wife at the time of the marriage be the separate property of the consort who held it, it follows that the right of acquisition secured to Power by the contract of himself and Hewitson with the State of Coahuila and Texas remained his separate property upon his marriage and did not fall into the community.

But this comes short of settling the point under consideration. The inquiry still remains, is the status of the property to be determined by the acquisition of the final title or by the origin of the title? Upon this point we have found no direct expression in the authorities upon the Spanish law. But in Louisiana, where the community system prevails, the question has been set at rest by repeated decisions of the Supreme Court of that State. In the case of Barbet v. Langlois, 5 La. Ann., 212, the husband at the time of his marriage was possessed of a tract of land fronting on Bayou Placquemine. By a statute of the Congress of the United States the owners of land in Louisiana fronting on any water course were given a preference right to purchase the vacant lands lying adjacent to and in rear of his plantation, and upon his death the question arose whether the land so purchased was his separate property or belonged to the community of himself and wife. It was

held to be of his separate estate. After quoting Pothier, to the effect that .he individual acquisitions of the spouses are community property only when the title or cause of the acquisition has not preceded the marriage, the court in their opinion proceed to say: "He [Pothier] gives numerous examples in illustration of this rule. A person, says he, who died before my marriage, has left me by will an estate, upon a condition which is not accomplished until after my marriage. The estate is my separate property because the will is my title, and it preceded the marriage. So where I have bought an estate before marriage, at a sum below the half of its just value, and after marriage I give validity to the sale by paying my vendor the residue of the just price, the estate is my separate property." Again, after quoting from Pothier to the effect that if a parent die after having sold property with the right of redemption, and the heir redeem it with community funds, it becomes his separate property,—although he did not inherit the property, but merely a right of redemption,—the court say: "The doctrine is a deduction from the maxim, is qui actionem habet, ipsam rem habere videtur. Now, although the illustrations we have cited are not identical with the one at bar, they present a very strong analogy. It is true that the land was not purchased from the United States until after Langlois' marrirge. But the 'cause' of the acquisitions may be fairly considered as having preceded the marriage. It was because he was the owner of the front land, an ownership acquired long before, that under the liberal legislation of Congress he was allowed a preference to enter, and that, too, at a low price, specific lands, which may perhaps have been worth much more." The same ruling was made in the case of the Succession of Morgan, 12 La. Ann., 153, in which the court say: "But we consider the decision in the case of Barbet v. Langlois, 5 Ann., 212, as decisive of this question. The only right to which the community is entitled is that of claining the reimbursement of the sum paid on account of the entry of the double concession, if such payment has been made out of the funds of the community."

The principle was also embraced in the later case of the Succession of Moseman, reported in 38 La. Ann., 219; and the previous rulings of the court were followed. In that case, the husband, a short while before his marriage, had taken out a policy of insurance on his own life, payable "to his executors, administrators or assigns." After his marriage the premiums were paid from community funds. After his death, upon settlement of his estate, the question was agitated whether the money paid by the insurance company upon the policy belonged to the community; and it was held, that it was property of his separate estate, but that it was chargeable in favor of the community with the premiums which had been paid with community funds. The court in that case say: "The contract creates certain rights and obligations which spring into existence the moment it is formed. Thus, at the date of the policies, Moseman acquired for himself the right to receive, at his death, through his executors, administrators or assigns, the sums stipulated to

be paid, subject to the condition of compliance with his own engage-
ments to pay the premiums as they fell due. This condition having
been complied with, 'has a retrospective effect to the day that the en-
gagement was contracted.' C. C., 2041. The character of the interest
and of the ownership thereof takes its impress from the date of the con-
tract." The quotation in the opinion is from the Civil Code of Louis-
iana. But the same rule seems to prevail under the Spanish law.
Schmidt says: "When the condition is accomplished, it refers back to
the time of the making of the contract, and it is considered as made at
that time; but if the condition be not duly accomplished, it is consid-
ered as never made." Schmidt's Spanish Law, art. 512. See also
Escriche, under the words "Obligacion Condicional," to the same effect.

Our own decisions are in harmony with the principles announced in
the cases referred to, although as we have said—the precise point seems
not to have been determined. In Mills v. Brown, 69 Texas, 244, a
widow, the head of a family, was entitled to acquire a homestead by
settling upon the public domain, causing a survey to be made of the
land, and by a continued residence thereon with an improvement of the
same. While still a widow she made application for the land and paid
the surveying fees. Thereafter she married, and moved with her hus-
band upon the property. The conditions of the law were complied
with, and, she having died, a patent issued to her heirs. The question
came up in a suit between the heirs and a purchaser holding under the
husband. It was held that the land was community and not separate
property, and that the heirs were entitled to recover only one-half and
the surveying fees paid by their mother. The court, speaking through
Chief Justice Willie, say: "To ascertain, therefore, the status of the
property in controversy, we must find out by whom the first actual
settlement upon it was made, of what the family consisted who first
occupied the land, and in whose behalf an application could there-
after be made for a homestead pre-emption. The evidence upon that
point is clear and undisputed; the settlement was made by Yarborough
and his wife, formerly Mary Roberts, and her children by a former
marriage. This initial and absolutely essential step was the joint en-
terprise of husband and wife, the occupation was continued by them
jointly so long as the wife lived, and by the husband till the title ma-
tured. Considered in reference to this state of facts alone, there can not
be a shadow of a doubt that the husband had the same interest in the
land as that held by the wife or her heirs, and that it was community
estate. We are of opinion that the facts that Yarbrough's wife had,
before marriage, filed a pre-emption claim to the land and paid the sur-
veying fees out of her own money, do not affect the right of her hus-
band to a community interest in the homestead pre-emption. The law,
as we have seen, does not contemplate that a survey shall be made on
an application therefor filed until the pre-emptors have actually settled
upon the land. Such acts must necessarily enure to the benefit of the
family who make the first settlement, and no steps taken previous to

that time by any member thereof for the benefit of any portion of the family and the exclusion of the remainder, can defeat the object of the law, which is to give to actual settlers a home upon land previously occupied by them."

In Manchaca v. Field, 62 Texas, 135, the husband obtained a concession for the purchase of eleven leagues of land to be selected by him under the 24th section of the Colonization law, March 24, 1825. He obtained the final title to ten leagues under the concession granted to him, but before the extension of that title the wife died. The grant was held to be community property. In that case the court say: "It is urged by the defendants that, although the concession had issued in the life-time of Mrs. Sanches, no step had been taken to appropriate any land under it; that, before the grant could be made effectual by the issuance of the final title, it was necessary to obtain the consent of the empresario to locate the concession within his colony; that the particular land must have been selected, and surveyed and classified by an authorized surveyor, and the survey and classification approved by the commissioner, and that the fees of the empresario and other colonial officials, and the amount due the government for the land according to its classification, must have been paid or secured; and that the mere concession, which was nothing more than a license to purchase so many leagues of the public domain, to be subsequently selected, and at a price and on terms to be subsequently determined, ought not to be treated as property in being at the death of Mrs. Sanches so as to entitle her heirs to claim a community interest in the land afterwards granted under it. There is much force in the argument, and it finds an apparent sanction in Webb v. Webb, 15 Texas, 274; Walters v. Jewett, 28 Texas, 192, and perhaps other decisions of this court; but the later decisions and the weight of authority seem to favor the proposition of appellants, that the concession having a money value, and being the subject of sale, was property, in which Mrs. Sanches had a community interest which descended to her heirs at her death, and which attached to the grant subsequently extended in the name of her husband. Porter v. Chronister, 58 Texas, 54; Wilkinson v. Wilkinson, 20 Texas, 244; Yates v. Houston, 3 Texas, 452." See also Hodge v. Donald, 55 Texas, 344. All these cases turned upon the determination of the question, whether or not the party taking the initial step in the acquisition of the property was at the time married or single.

Nor do we regard either the ruling in Webb v. Webb, 15 Texas, 275, or that in Walters v. Jewett, 28 Texas, 192, as being in conflict with these views. In the former, Judge Lipscomb, speaking for the court, says: "The question presented by this statement of facts is, was the property in controversy held by the husband and wife at the time of her death as community property? If it was, there is no question but that her heirs are entitled to the one-half, after the payment of the community debts. The statement of facts shows conclusively that the title to the land was not obtained until after the dissolution of

the matrimonial relations by the death of the wife. Does it show that anything had been done before this dissolution, giving a right in law to demand the title that subsequently issued to the husband, on which an equity could be raised in favor of the heirs of the wife, and attach to the land? The record of the statement of facts shows that the land had been selected before the death of the wife, but does not show in what way it had been selected, whether by application to the commissioner or in any other way. It does not show that the requisite qualifications of the applicant had been decided upon by the commissioner, or that anything had been done that was essential to the validity of the grant, prior to the death of the wife. We have no evidence that the necessary qualification of the colonist had been adjudicated upon by the commissioner before the date of the title; and at that time the husband was qualified as a head of a family to have received the same quantity of land, as his children were in the country with him." This extract, as we think, makes it manifest that if it had been shown that the land had been lawfully selected and the qualifications of the husband adjudicated before the death of the wife, the result would have been different. The ruling, that the immigration of the husband with the wife did not of itself entitle the latter to a half interest in the land granted by reason of that immigration, may be in conflict with other decisions upon that point, but in so far as the decision bears upon the question under consideration it seems to us to be in accord with our cases previously cited.

In Walters v. Jewett, supra, we do not understand the court to hold that the heirs of the wife were not originally entitled in equity to an interest in the land by reason of their mother's community right. There, during the life of the wife the husband sold one-half of his right to acquire land from the Republic by reason of his immigration as the head of a family. After her death he sold the other half. Both sales were made before the certificate issued. The certificate was issued to Jewett, his assignee, and the patent issued in the name of Jewett. The court hold, that the heirs of the wife had a mere equitable claim upon the land, and that it could not be recovered in action of trespass to try title.

In most of the cases cited, where the initial step in procuring title was taken, the purpose was to acquire a specific tract of land. In that respect the case before us is different. Power and Hewitson were not entitled, upon compliance with the conditions of their contract, to any specific tract or tracts,—they were entitled only to so many leagues of land, which were to be selected. In this respect it does not differ from the case of Manchaca v. Field, before cited. In that case, however, the concession was obtained while Sanches was a married man, and the lands were held to be of the community although the final title was not extended until after the death of the wife. If he had been single at the date of the concession and had married before the issuing of the title,

TEXAS SUPREME COURT REPORTS.

the lands would doubtless have been held his separate property and the case would have been precisely in point.

In this cause the title originated in the contract of Power and Hewitson with the State of Coahuila and Texas. That contract, in the language of the Louisiana court, was the "cause" of the title. Power was single when it was entered into, and the right to earn the lands acquired by it was his separate property. The title relates to its origin, and must take the impress of its character from it.

The rule of Spanish law as to improvements made with community funds upon the separate property of the husband or wife is thus stated by Schmidt: "Money, expended in improving property belonging to one of the spouses, belongs to the community, but gives the other no claims to the property itself." Schmidt's Spanish Law, art. 48. It was so ruled by the Supreme Court of Louisiana in cases in which the rights of the parties depended upon the laws of Spain. Hughey v. Barrow, 4 La. Ann., 248; Frique v. Hopkins, 4 Mart. N. S., 212. These were cases in which the lands of one of the spouses were improved from community funds. We find no rule laid down in the Spanish laws which applies to a case precisely like this; but, as we understand that law, improvements, such as buildings and the like, made upon the land of one of the consorts by the community must, upon partition, be credited to the community estate, and are made a charge upon the property. 2 Febrero Reformado, arts. 2403–4, p. 95. The question here must therefore be determined by analogy to that principle. In Mills v. Brown, before cited, the expense of acquiring the land (which was held to be community property) was borne in part by the separate money of the wife. It was ruled that the heirs of the wife were entitled to one-half of the land as community, and to a reimbursement of one-half of the expense so paid as a charge upon the husband's half of the property itself. They were not entitled to recover the other half of such expense, because they received one-half of the land; and in that had one half of the benefit of the expense. This decision would, we think, be absolutely controlling but for the fact that it is a ruling upon our own statutes and not upon the Spanish law. But we think the principle was deduced from the latter law. In the case of Moseman's Succession, before cited, the doctrine was distinctly announced and applied. It follows, as we think, that upon partition of the property in controversy the land was chargeable in favor of the community with whatever the community may have contributed in labor and funds to its acquisition.

Having disposed of the preliminary points which as we think are necessarily involved in the questions propounded by the Court of Civil Appeals, we proceed to answer as follows:

1. Although both under our statute and under the Spanish law the presumption of community property arises from the naked fact that it was acquired during the marriage, yet when, as in this case, upon an exhibition of the whole title it appears that its origin preceded the mar-

riage and that it is the separate property of one of the spouses, we are of the opinion that the presumption no longer prevails.

2. The lands in controversy appearing to be of the separate estate of Power, we are of opinion that in order for the heirs of the first wife to establish a charge upon them for a reimbursement of community funds expended in their acquisition, the burden was upon them to prove that the funds had been so expended. 2 Febrero Ref., art. 2414, p. 98.

3. We do not deem it necessary to decide the third question. The lands being the separate property of Power, and the heirs of the wife as such having no title in the property itself, the questions are,—Were community funds invested in acquiring them? And if· so, how much?

4. The fourth question we consider abstract. We think this suffi ciently appears from what we have already said.

5 and 6. If, as asserted in defendants' plea, the parties have had common use and enjoyment of the property in question as tenants in common, we are of the opinion that the demand of plaintiffs for reimbursement of the community for community funds expended in their acquisition could be asserted at any time in a suit for partition. In other words, we think that the matter was adjustable upon the final division of the property, and that it was not necessary to assert the claim until partition was sought. 2 Febrero Ref., art. 2250, p. 64.

In our view of the law, the question of stale demand only arises in case the appellants in their pleadings alleged that community funds had been used in the acquisition of the lands, and sought, at least in the alternative, a restitution of their mother's half of the community funds so used. Whether or not they did this, we cannot determine from the statement which accompanies the certificate.

This opinion will be certified to the Court of Civil Appeals of the First Supreme Judicial District as an answer to the questions propounded.