MARGARET J. JOHNSON ET AL. V. N. WARREN NEWMAN ET AL.

1. SALE OF INCHOATE RIGHT TO LAND.—The right to lands guaranteed to citizens of Texas by the Constitution of the Republic, (sec. 10, General Provisions,) was but an inchoate right to get that quantity of land out of some part of the public domain in the manner to be prescribed by law. It was, however, a right or interest of such character as to be the subject of contract.

2. HEADRIGHT CERTIFICATE.—When issued, a headright certificate is in the nature of personalty, and can be sold and delivered as chattels, and a purchaser without notice of a prior assignment of the right to the certificate would take a good title.

3. SAME—PURCHASE WITHOUT NOTICE.—One who purchased and received a headright certificate without notice of a prior conveyance of the right thereto by the grantee before its issuance would take the better title.

4. SAME —The condition of such purchaser is not worse by his location and causing survey to be made by virtue of the certificate and paying the government dues for the land so located; owning the certificate, his location, &c., would secure the land.

5. SAME.—The doctrine of innocent purchasers, which ordinarily can only be invoked in favor of the holder of the legal title, applies to the holder of an equitable title purchased without notice in a case of conflicting equities; in such cases the court will decide upon the *very equity* of the case as presented.

6. TITLE BY ESTOPPEL.—A holder of a headright certificate by warrantee deed from the grantee upon the issuance of the patent becomes by estoppel possessed of the legal title to the land secured by such certificate and patent as against a holder of an assignment of the right to the certificate before its issuance.

7. SAME.—While to support a plea of *bona fide* purchaser it is necessary to prove payment of a valuable consideration, it is not necessary that such payment be adequate; proof by the purchaser of a headright certificate of payment of the government dues, and for the location and survey of the land secured by him under such certificate, was sufficient.

8.—SAME.—But the burden of proving such payment of purchase money does not devolve upon the defendant where the plaintiff has to show himself entitled to equitable relief; in such case plaintiff must show the defect in the title he attacks, and the non-payment of such purchase money by his adversary.

9.—LIMITATION—WHEN IT BEGINS.—The sale and delivery of a headright certificate after its issuance by the grantee to another was a repudiation of a former conveyance of the grantee's right to such land certificate, and when the holder of such elder conveyance had knowledge or means of knowing such repudiation of his rights by the grantee of the certificate, limitation would run from the date of such repudiation.

APPEAL from Henderson.   Tried below before the Hon. John G. Scott.

This is the second appeal in this case.   (35 Tex., 166.)

The facts are fully stated in the opinion, except as to the testimony relied on as supporting the pleas of limitation and adverse possession not discussed by the court.

*Thomas B. Greenwood,* for appellants.

*Walton, Green & Hill,* also for appellants.

The case is this: Mitchell sold to Jack, in September, 1836, his right to his headright league and labor of land, which by the constitution of the Republic of Texas was vested in him.   This was before the passage of the land law of 14th December, 1837, which provided a method by which the right given by the constitution should be ascertained.   (General Provisions, sec. 10.)   The law of 14th December, 1837, was not put in operation until February, 1838, or, as stated by counsel in Walters v. Jewett, 28 Tex., until March, 1838.   It is at any rate certain, from the extensive machinery created by the act, that it could

not have been put into practical operation before the month of February. (Hartley's Dig., 580.)

Mitchell, after his sale to Jack, went into a different jurisdiction, and on the first day the land office was opened, or immediately thereafter, in the county of Houston, proved his right in his own name before that board, and from appearances, immediately after receiving the certificate, sold it to Kirchoffer, under whom the defendants claim.

Admitting that both parties were equally innocent, the question is, who has the better right: those claiming under Jack or those claiming under Kirchoffer?

The first position in opposition to the plaintiff's right to recover is that the right of Thomas S. Mitchell in September, 1836, was not property, and was not the subject of sale so as to pass title to the assignee.

That it was property, and a sale of it passed the title, it seems to us is beyond dispute.

Section 10 of the general provisions of the constitution of the Republic of Texas relating to this subject expressly recognizes the right to be property, and not only protects the assignments theretofore made, but also those of future assignees. Its words are:

"Every head of a family shall be entitled to one league and labor of land, and every single man of the age of seventeen years and upwards shall be entitled to one-third part of one league of land. All citizens who may have, previously to the adoption of this constitution, received their league as heads of families and their quarter of a league of land as single persons, shall receive such additional quantity as shall make the quantity of land received by them equal to one league and labor and one-third of a league, unless by bargain, sale, or exchange they have transferred, or may henceforth transfer, their right to said land, or a portion thereof, to some other citizen of the Republic; and in such case the person to whom such right shall have been transferred shall be entitled to the same as

fully and amply as the person making the transfer might or could have been."

That the word "unless" applies to the whole granting clause instead of applying only to the latter part of it, giving an augmentation to those who had received leagues as heads of families and quarter of leagues as single men, is manifest. Because to so restrict it would work great injustice to such persons as had sold their leagues or their quarter of leagues, and would make the previous purchaser of the right of such person entitled to the augmentation in his own name, a construction which would do violence to any rule of right which might be invoked, inasmuch as the object of the grant, viz: the original claimant, was the person in whose right the benefit was to accrue, and it would result in creating a benefit in his right which did not previously exist, and immediately giving such right to another who never bargained for it or gave any consideration therefor.

Such a construction is so repugnant to common justice and common sense that we will not dwell on the proposition. To bind the conclusion drawn by us it is only necessary to refer to the word "hereafter" in the clause, giving the power to sell by those to whom grants were already made, their augmentation to be acquired by the Constitution.

By what reasoning can it be shown or established that the Constitution intended to make a difference in the power or right of the classes of beneficiaries provided for by the section? The reason applying to all is the same, and the words are so used that we must conclude, as before stated, that the word "unless" applies to the whole granting clause of the section, and all persons receiving grants under it had the same power of alienation of their rights acquired thereby.

It follows that the word "unless," used in the clause cited, refers to the whole grant made in the article, and

gives it a peculiarly forcible meaning, for it not only rec-
ognizes the power to transfer the right given, and makes
the right of the assignee equal to that of the person who
sold to him, but it almost amounts to a prohibition against
the vendor to procure the issuance of the right in his name.

The practice under this law, as well as all other laws in
which the Government gives the title, has been that if in
the issuance of the right or paper evidence of title to land
it should be issued in the name of the vendor, the title will
at once inure to the benefit of him who had title, as the
Government will not issue a second and separate title to
the vendee, but will rather leave him to proceed against
the person who has wrongfully procured the title as a
trustee, who holds for the benefit of the true owner.    (Sil-
ver *v.* Ladd, 7 Wall., 228.)

The land law of December 14, 1837, (sec. 12, Hartley's
Dig., art. 1848,) expressly recognizes the sale of rights
to land, and authorizes the issuance of certificates to the
assignee; as it provides (page 584) that persons claiming
a right to land " by inheritance or purchase" shall not be
bound to take the oath required of the person whose right
is represented by them; and again in the same section
this expression occurs: "No purchaser of a headright
shall be entitled to receive a grant as assignee or in the
name of the original claimant, unless," etc.    This act,
though passed after the sale of the right in this case, shows
conclusively the cotemporaneous construction of the law,
and it was binding on the claimant and all others under
him, inasmuch as it was under this law the certificate was
issued.

But, independently of this, as a question of law, we
have abundant authority in the decisions of our court.
(Emmons *v.* Oldham, 12 Tex., 18;  Babb *v.* Carroll, 21
Tex., 769;  Smithwick *v.* Andrews, 24 Tex., 488;  Graham
*v.* Henry, 17 Tex., 167.)

The last case is so full and clear upon the question of

the assignment of such rights that the special attention of the court is directed to it. In that case, which was for the sale of a conditional headright certificate of the second class, the court, after showing the distinction between certificates of the second and third class, say: "Whatever exclusive right a man has in anything, he has a right to dispose of absolutely as he pleases, provided he makes no disposition of it prohibited by law. * * * Hence, any incipient title or contingent interest which is susceptible of being ripened into a title to lands may be assigned; and such has been the usage in this and other countries. It has never been supposed necessary to consummate the title before the right could be assigned." And, continuing, the court further say: "Of course the interest or right of the assignee would ultimately depend upon the performance of the precedent conditions by the grantee. * * * But there is nothing in the nature of the interest * * * to prevent its assignability."

And the rules here so clearly laid down are recognized by the elementary writers, whether the property sold in this case be regarded as a chattel or in the nature of realty. (Benjamin on Sales, pp. 57, 58; Greenleaf's Cruise's Digest, Book 4, marg. p. 89.)

The power of sale being established beyond dispute, the next inquiry is as to whether the title of the purchaser can be disturbed by any act of the seller or vendor.

If the property sold to Jack by Mitchell be regarded as a chattel, in accordance with the ruling in Randon v. Barton, 4 Tex., 289, then the rule is very clearly expressed by Mr. Benjamin in his work on Sales, p. 4, (Dodd & Co. v. Arnold, 28 Tex., 101,) where he says: "In general no man can sell goods and convey a valid title to them unless he be the owner or lawfully represent the owner. * * * A person, therefore, however innocent, who buys goods from one not the owner, obtains no property in them whatever," except in some cases noted, and the exceptions noted

are *market overt,* which does not exist in this country, sale by pawnee, and the like.

Nor could the doctrine of agency be brought to bear so as to give the defendants a title, because an agency must grow out of some contract, express or implied, which did not exist here. Nor can a title grow out of the doctrine of possession of chattels, because the right to land sold by Mitchell was a vested right in him by the Constitution and laws, and the subject of assignment and the sale made was a full and complete divestiture of his right, and the written deed executed and delivered was a delivery of the thing sold as far as it was possible to be delivered, and was one which by the laws was fully authorized, and which could be made effectual as to the thing sold without any further act to be done by the seller or vendor; for it is provided in the law under which the certificate was obtained (sec. 12 of the act 14th December, 1837) that in case the right to the certificate was owned by a purchaser, such purchaser was not bound to take the oath which was required of the original claimant, but was only bound to prove that the original claimant had the requisite qualifications. (Hartley's Dig., p. 584)

Nor can the defendants gain any assistance by reason of any negligence of the plaintiff in respect to his title, whereby Mitchell was permitted to deceive Kirchoffer; for it must be remembered that on the first day, or at least the first week, after the law went into operation Mitchell anticipated his vendee, Jack, and took out the paper evidence of right, and that Kirchoffer immediately bought it, thus cutting off all power on the part of Jack and his vendees of obtaining a certificate in their own name.

Nor can the defendants derive any right on the doctrine of innocent purchaser, for this doctrine does not apply to choses in action or chattels, or to equities. (See cases cited hereafter.)

So that in any view we take it, as a chattel or chose in action, the defendants have no basis upon which to build their right for a title to the land in controversy.

If, on the other hand, the title of the plaintiff was an acquisition of realty, or a thing in the nature of realty, there can be no pretense of title in favor of the defendants. For the only doctrine that can be invoked to sustain the subsequent title acquired is that of innocent purchaser for a valuable consideration without notice. Now, in setting this up, it must be both pleaded specifically, as well as proved, which has not been done here. (White & Tudor's Leading Cases in Equity, vol. 2, 59–41, 61, 63–83, 85; Vattier *v.* Hinde, 7 Pet., 252; Watkins *v.* Edwards, 23 Tex., 447; Rogers *v.* Burchard, 34 Tex., 441.)

But the doctrine applies only to him who has purchased the legal estate. (White & Tudor's Leading Cases in Equity, vol. 2, 39, 41; Vattier *v.* Hinde, 7 Pet., 252; Boone *v.* Chiles, 10 Pet., 177; Shirras *et al. v.* Caig & Mitchel, 7 Cr., 34; 2 Dev. & Bat., 395; 3 Iredell, 117; 17 Vesey, 290; Pinson & Harkins *v.* Ivey, 1 Yerger, 302; Craig *v.* Leiper, 2 Ib., 193.)

In the case cited from 17 Vesey, Lord Eldon said: "There is no instance of the plea being allowed without averment that the party purchased from was seized, or pretended to be seized, in fee; " and in the case of Pinson & Harkins *v.* Ivey, (3 Yerg., 302,) the court say that the doctrine of purchase for valuable consideration without notice does not apply between equities, and that a purchaser of a chose in action, or any equitable title, must always abide by the case of the person from whom he buys, and that in such cases the rule is, he who is first in time is best in right, (citing Sugden on Vendors;) and this doctrine was fully sustained by Judge Catron in the case of Craig *v.* Leiper, 2 Yerg., 193.

There is, then, no pretense of a right in defendants superior to the plaintiffs, considering the thing sold as

realty, because the legal title to the land was at all times and still rests in Thomas S. Mitchell or his heirs.

That the purchase by Jack was a purchase of realty is believed to be the case. He purchased the right to Mitchell in his headright league and labor of land, not his land certificate, for that was not provided for or issued, but to the land which could be acquired by virtue of the right of Mitchell, and which, under the Constitution of the republic, was declared to be a grant of land.

Nor is the force of the position assumed by the plaintiff interfered with by the registry laws, because the purchase of Kirchoffer was only of the land certificate, and was made before the land was located, and the registry laws did not apply. (Blankenship v. Douglas, 26 Tex., 225.) And the deed from Kirchoffer to Collins is a deed of gift.

So that we come to the conclusion that the title of the plaintiffs was a perfect, equitable title to the land located by virtue of the certificate to Thomas S. Mitchell, and was superior to that claimed by the defendants.

T. J. Word and Jackson & Jackson, for appellees.

MOORE, ASSOCIATE JUSTICE.—This is an action of trespass to try title, brought by appellants against appellees October 13, 1870, in the District Court of Henderson county, for the recovery of a league and labor of land, patented December 11, 1847, to Thomas S. Mitchell, by virtue of a certificate issued to him by the Board of Land Commissioners of Houston county on the first day of March, 1838.

In support of their title to the land described in this patent appellants rely upon a contract executed in the presence of B. C. Franklin, district judge and ex officio notary public, (as he is styled in the instrument,) in the town of Quintana, September 2, 1836, between Thomas S. Mitchell and William H. Jack, whereby said Mitchell, in

consideration of three hundred dollars therein acknowl-
edged to have been paid him, "sells and conveys to said
Jack all his right, title, and claim" to a league and labor
of land, which, as a married man, he says he is lawfully enti-
tled to receive from the Government. The right and interest
acquired by Jack by this contract he assigned and con-
veyed December 10th, 1837, to F. A. Sawyer. And on
the 5th of May, 1847, said Sawyer conveyed to Stephen
Crosby, the ancestor of appellants, by quit-claim deed,
"said league and labor of land to which said Thomas S.
Mitchell, as a citizen of Texas, and to which I am entitled
by virtue of my purchase from said William H. Jack."
But no reference is made in the deed to the locality of the
land, nor to the fact that a certificate had been issued to
said Mitchell which long previously had been located, sur-
veyed, and patented.

On the part of appellees, it is shown that on the 1st of
March, 1838, a certificate for a league and labor of land
was issued by the Board of Land Commissioners of Houston
county to Thomas S. Mitchell, which he on the same day
conveyed by a written transfer upon said certificate to
John H. Kirchoffer, the ancestor of some of the appellees,
and party under whom the others claim. Said certificate
was at the same time delivered to said Kirchoffer, and on
the 16th of March, 1838, he procured the land in contro-
versy to be located and surveyed under it, for which he
paid $100. He also paid the Government dues upon it,
and caused the certificate and field-notes to be returned to
the General Land Office. On the 21st of the same month
Mitchell also executed and delivered to said Kirchoffer
an instrument in writing, which says that, "in considera-
tion of the sum of $1,200 to be secured to be paid, do ap-
point John H. Kirchoffer, of this" (Houston) "county,
my true and lawful attorney to obtain the field-notes to
made in surveying a league and labor of land to which I,
as a married citizen of Texas, am entitled, and to obtain a

title for the same from the proper authorities, and do hereby authorize the said John H. Kirchoffer to sell or convey, and a warrantee title to make to any person," &c. And in a subsequent portion of said instrument he binds himself in the sum of ten thousand dollars to make said Kirchoffer, on demand, a good and lawful title, &c. And on the — day of March, 1838, said Mitchell also executed to said Kirchoffer a warrantee deed for said land, describing it as follows, to wit: "All my right, title, and interest in and to a league and labor of land situated in Nacogdoches county, on or near Cedar creek, on the east side of the Trinity, designated as ———— ————, and do bind myself," &c.

The land is described in the patent thus: "In Nacogdoches county, on Cedar creek, 5,600 varas east and 10,000 varas north of where the county lines of Nacogdoches and Houston intersect the Trinity river, beginning," &c. Then follows the specific metes and boundaries as given in the notes of the surveyor from his field-book of the survey. There was also evidence on the part of appellees of payment of taxes, and acts of ownership and partial possession at least, if not continuous, for the last eighteen or twenty years.

We have thus contrasted the evidence upon which the parties respectively rely to support their claims to the land in dispute, because we think to do so, is sufficient to show that appellants totally failed to establish title on any ground upon which the court should have decreed title to them, even if the pleading in this case would warrant such a judgment.

If it is conceded that the Thomas S. Mitchell who sold the right to a league and labor of land guaranteed to him by the constitution of the republic of Texas to Jack at Quintana in September, 1836, is the same Thomas S. Mitchell who was proved to have been a citizen of Houston county in the years 1837 and 1838, to whom the certificate

was issued, by which the land in controversy was obtained, of which there is no proof but the identity of the names, it cannot be seriously insisted, in the light of the former decisions of this court in cases of like character, that the evidence upon which appellants rely is sufficient to enable them to maintain their action against parties in possession, and certainly having equal equities with themselves, laying out of view all consideration of their legal title.

The whole theory of appellant's case seems to rest upon the erroneous supposition that they themselves hold the legal title to the land, or if not, that the legal title is still in Mitchell, and that they certainly have the older, and therefore superior, equitable title to it. In neither of these propositions can we agree with them.

Whether appellants have any title or right which they can now assert to this land depends upon the proper construction of the contract between Mitchell and Jack, and the effect to be given it against parties who have dealt with the former in ignorance of this contract.

Though at the date of this contract Mitchell had neither a title to the land in controversy nor to the certificate under which it has been acquired, still there was, undoubtedly, guaranteed to him by the constitution the right to this amount of land on his complying with the requirements to be prescribed by law. This right, though neither real nor personal property *in esse,* was nevertheless an inchoate right to get that quantity of land out of some part of the public domain at the time, and in the manner to be afterwards provided and determined by the Government. It was a right or interest of such character as to be the subject of a contract. (Emmons *v.* Oldham, 12 Tex., 26; Graham *v.* Henry, 17 Tex., 167; Babb *v.* Carroll, 21 Tex., 769; Andrews *v.* Smithwick, 24 Tex., 488.) And Jack by this contract was entitled to have applied to the Board of Land Commissioners of the proper county, and on proof of the facts required by law to have had the certificate of said

Mitchell issued to him as his assignee, or if issued in Mitchell's name, to have had it delivered to him. And in either event he would have been secured against a valid transfer of it by Mitchell. (See 10 Gen'l Provisions, Constitution of Republic and Land Law, December 14, 1837.)

As the certificate when issued was not land, but a mere right to acquire land which could be sold and transferred as a chattel, it was not real, but of the nature and character of personalty. (Randon v. Barton, 4 Tex., 289.)

It follows, therefore, that the contract between Mitchell and Jack was valid and binding between themselves, and might be enforced against subsequent purchasers with notice. But still this could not be done against one who bought and received the certificate in good faith without notice of the contract. (Walters v. Jewett, 28 Tex., 200; Baggett v. McKenzie, Id., 582; Wethered v. Boon, 17 Tex., 146.)

This principle is also fully recognized in the cases previously cited to establish the validity of the contract between the parties, and is indeed in accord with well established elementary rules touching the sale of personal property without actual or constructive delivery. (1 Parsons on Con., 441; White's Recp., vol. 1, p. 341, et seq.)

The certificate issued to Mitchell, and there is not the slightest evidence from which it can be inferred that Kirchoffer had ever heard of Jack's contract, and though it be admitted that Mitchell acted in bad faith in not having the certificate issued to Jack as his assignee, or in selling it when issued to himself, still, as the title, as well as possession, was in him, his transfer and delivery of it vested in Kirchoffer the title, or legal title, if such a distinction could be recognized in respect to property of this kind, while appellants and those under whom they claim had only a contract or right of action for it. Certainly had they sought to divest this title out of Kirchoffer before the certificate was located, the burden would have been on

them to have shown the defect in his title. Otherwise, he, having like equities with them, and also possession and title, would have stood upon the vantage ground. (See 2 White & Tudor, Lead. Cas. Eq., 88, and cases previously cited.) Certainly his position is not worse by procuring and paying for the locating and surveying of the land, paying the Government dues upon it, and getting a formal deed. Surely the fact that the deed for the land was made before the date of the patent does not change the position of the parties, and notwithstanding Kirchoffer's additional equities, to which we have just referred, give appellants the superior equity when before theirs was the weaker.

This seems to be the result in effect of the proposition for which appellants contend. For, say they, until the patent issued the legal title was in the Government, and when the Government parted with it, it inured by operation of law to them by reason of the contract between Mitchell and Jack, or it is still in Mitchell. And in either event they contend they are entitled to a judgment against appellees, because as they have only an equitable right they are not entitled to protection under the doctrine of innocent purchasers without notice; for this doctrine, they insist, applies only to parties who have purchased the legal title. That this is the general formula in which this rule is announced, and that ordinarily this doctrine, by which in a court of equity the elder legal title will be set aside for the benefit of the younger one, is not applicable to cases depending upon purely equitable considerations will not be controverted. (2 White & Tudor Lead. Cas. Eq., p. 39, *et seq.*, and cases there cited.) Though this rule seems not to be without exception, for the like protection is afforded to equitable titles to which the registration laws are applicable. (Flagg v. Mann, 2 Sum., 551.) That it is not applicable between equities is also evident from the fact that in such cases the court will decide according to the very equity of the case, and no precise formula can be prescribed

41

by which, as between purely equitable titles, this can be ordinarily ascertained.

It cannot be properly said, however, that appellees only had an equitable title. Kirchoffer had a warrantee deed from Mitchell, and when the patent issued the legal title passed to him by estoppel.

It is also insisted that appellees' defense failed because they did not prove payment of the purchase-money for the land except by the recitals in the deed to Kirchoffer. But the authorities to which we are referred, show that while it is necessary to prove the payment of a valuable consideration, it is not necessary to prove that the amount paid was a full and adequate consideration. Payment of the government dues and for the location and survey of the land was shown.

But it was not incumbent upon appellees to prove payment of the purchase-money. This is undoubtedly necessary to enable the junior purchaser to protection himself against the superior legal title, but it is otherwise when the plaintiff has to show himself entitled to equitable relief against the apparently better right of the defendant. In such cases it devolves upon the plaintiff to show the defect or want of equity in the title he attacks.

But there is another ground upon which it is equally evident that appellants cannot now be relieved, though it might have been otherwise if they, or those under whom they claim, had moved in the matter at an earlier day. There was a breach and repudiation of his contract by Mitchell when he procured the certificate in his own name and sold it to Kirchoffer. This action was commenced more than thirty-four years after the date of the contract, which it in effect seeks to enforce, and more than thirty-two years after its repudiation by obtaining and dealing with the certificate in direct violation of its stipulations, and near twenty-eight years after notice might have been had of these facts by reason of the issuance of the patent.

No diligence whatever was ever used by Jack, or those claiming under him, to secure or enforce their alleged right to the certificate, nor is any excuse made for their failure to do so. Nor does it appear that even a claim was ever set up to this particular land by any of them prior to the institution of the present suit. Under these circumstances there can be no hesitancy in saying that the prosecution of this suit at this late day is the assertion of a stale demand, even though we could say, which, however, we do not feel called upon to do, that the evidence would not warrant the verdict of the jury on the plea of the statute of limitations, especially since motions for new trials, because the verdict is contrary to or against the evidence are addressed mainly to the equitable consideration of the court.

There being no error in the judgment of which appellants can complain, it is affirmed.

AFFIRMED.