## C. A. WATERMAN v. M. R. CHARLTON ET AL.

### No. 1961.   Decided June 9, 1909.

**1.—Grant to Heirs.**

By a grant of land to the heirs of one deceased is intended those who would have inherited the right granted had it existed at his death.   (P. 511.)

**2.—Land Certificate—Descent and Distribution.**

The grant of a right to land in Texas, though evidenced by an unlocated certificate, which for most purposes is treated as personal property, should, it seems, be governed by the laws of descent and distribution of this State, and not by those of the State of the domicile of the grantee.   (Pp. 512–514.)

**3.—Same—Grant to Heirs of Deceased.**

A married man living in Virginia, and whose wife remained there, came to Texas in 1835, enlisted in the army of the Republic, and was killed in the massacre at Goliad in 1836.   A certificate to land by virtue of his service issued to his heirs in 1849, and was located and patented to his heirs in 1852.   Held, that the title to the land was in those who were heirs of deceased by the laws of Texas, irrespective of the question of his citizenship, and was not governed by the laws of Virginia.   (Pp. 511–514.)

Error to the Court of Civil Appeals for the Fifth District, on error from Wood County.

Waterman sued Charlton and others, and prosecuted error from a judgment in favor of defendant.   On affirmance he obtained writ of error from the Supreme Court.

*Mounts & Jones* and *Leake & Henry,* for plaintiffs in error.—
William Wallace, through whom both parties to the controversy claimed title, having, under the undisputed evidence, his domicile in the State of Virginia at the time of his death, and the right to the property inherited being personal property, the law of the domicile of the deceased would govern, and the law of the State of Virginia vesting two-thirds interest in the land in controversy between Jarvis and Waterman into C. A. Waterman, in the event that the child of Wm. Wallace survived Wm. Wallace, the jury should have been so instructed.   Blucher v. Milsted, 31 Texas, 622; Cross v. Everts, 28 Texas, 534; Barker v. Swinson, 66 Texas, 409; Jones v. Lee, 86 Texas, 31; Melton v. Turner 38 Texas 84; Goodrich v. O'Connor, 52 Texas, 375.

The record shows undisputedly that William Wallace was a resident of the State of Virginia.   It does not show any intention on his part to change his domicile.   10 Amer. & Eng. Ency. of Law, 11; Russell v. Randolph, 11 Texas, 463; Cross v. Everts, 28 Texas, 523; Ex parte Bloomer, 27 Texas, 741; Halliman v. Peebles, 1 Texas,

689; McIntyre v. Chappell, 4 Texas, 197; State v. Barrow, 14 Texas, 181.

It is agreed by both parties that the heirs of William Wallace were to be determined at the time of his death. At the time of his death, under the law prevailing in the State of Texas, the wife was not an heir and could not claim under any grant made to the heirs of an individual. Babb v. Carroll, 21 Texas, 771; Van Sickle v. Catlett, 75 Texas, 409. The legislative grant being expressly limited to heirs of the person who fell under Fannin, the wife, under the law prevailing at that time, was necessarily excluded from any participation in the property.

. *Hart & Hart* and *A. J. Britton,* for defendants in error.

MR. JUSTICE WILLIAMS delivered the opinion of the court.

This controversy is over the title to two tracts of land patented to the heirs of William Wallace, who was killed in the massacre at Goliad, and the only question is, who were his heirs? The answer depends upon the further question whether the devolution of the title or right, in virtue of which the land was granted, was in accordance with the laws of Virginia or those of Texas, in force when Wallace died. It is conceded by both parties that this judgment is right if the laws of Texas are to be applied, and that it is wrong if those of Virginia control.

The Court of Civil Appeals held that the laws of Texas governed because Wallace, before his death, had become a citizen of Texas. We reach the same result, but for a different reason. The material facts are these: Wallace was born and reared in Virginia and his home was there until he left, as stated below, and, therefore, his domicile was there, unless the facts are sufficient to show that he acquired a citizenship in Texas. All that appears which is pertinent to the question is that he was married in Virginia in 1835, and lived with his father-in-law a few months and then came to Texas for the purpose of enlisting, and did enlist, in the Texas army in which he served until his death in 1836. His wife survived him, and, after his death, gave birth to a child, who died before the mother. The certificate under which the land was patented was issued December 26, 1849, entitling the heirs of William Wallace to 1920 acres of land in virtue of his services in the army of the Republic for three months, from December 25, 1835, to March 27, 1836, and of his having fallen at the massacre at Goliad. This certificate was located and patented to the heirs of Wallace in 1852.

The defendants in error claim under Mrs. Wallace, upon whom the laws of Texas would have cast the descent, and plaintiff in error claims under other relatives of Wallace, who would have inherited according to the laws of Virginia.

It is agreed on all hands that the persons intended by the grant to the heirs of Wallace were those who would have inherited the right granted had it existed at his death, and so the decisions of this court hold. Goodrich v. O'Connor, 52 Texas, 375; Wardlow v. Miller, 69 Texas 395.

Without going into the question discussed by the Court of Civil Appeals as to Wallace's citizenship, we hold that the laws of Texas determined who were his heirs and governed the descent of the property irrespective of his domicile. The promise made by the "Declaration" of 1835 was that Texas "will reward by donations in *land* all who volunteer their services in her present struggle, and receive them as citizens." This promise was redeemed by the subsequent passage of laws prescribing the manner in which the lands could be acquired by those was accepted this offer, or by the heirs of those who perished in the struggle. The certificates were authorized as the mere evidence of the right, and the other prescribed steps as the procedure through which the land should be acquired. The creation of the right to the land and the prescribing of the modes in which full title might be obtained were but successive steps to that which ultimately took place —the grant of the land itself. In the decision of such questions as that before us, the laws which authorized the issuance of evidences of right to acquire land should be regarded as if they were grants of the land ultimately acquired. The word heirs in such a grant ought, we think, to be taken as referring to those who at the death of the ancestor would have inherited that kind of property which was being granted—land. As the laws of Texas controlled the descent of titles to land within her jurisdiction this view results in the conclusion that the heirs referred to were those upon whom such laws cast the descent.

The opposite view is based upon decisions of this court which treat unlocated land certificates as being in themselves personal property, or chattels. Undoubtedly they have been so treated for many purposes. Assignments or transfers of them have not been required to be in writing. (Cox v. Bray, 28 Texas, 247.) In probate proceedings the laws governing the sale of personal property have been held to be applicable rather than those concerning sales of land. (East v. Dugan, 79 Texas, 330.) The provisions of law for the registration of land titles have been held not to apply to instruments assigning certificates. (Shifflett v. Morelle, 68 Texas, 389.) They can be wrongfully converted so as to subject the wrongdoer to an action for their value. (Nelson v. King, 25 Texas, 664; Barker v. Swenson, 66 Texas, 408.) In the distribution of estates under the laws of this State they have been treated as descending as personal property. (Porter v. Burnett, 60 Texas, 220; Harvey v. Cummings, 68 Texas, 605; Harvey v. Carroll, 72 Texas, 65.) But no decision of this court has gone to the extent of holding that the title to them and, through them, the title to land in Texas, is controlled by the laws of another State or country in which the owner of them has his domicile, and that is the contention with which we have to deal.

In the opinion of Judge Stayton in the case of Barker v. Swenson, 66 Texas, 408, the distinction is drawn between the mere paper certificate, as being, in itself, a chattel, and the right to the land called for by it, and it is held that while a right of action for the possession of that paper, or for damages for the wrongful conversion of it, may be barred by limitation, this effects no change in the right to the land. It is further pointed out that the reason why

an assignment of a certificate, as a chattel, passes the right to the land, is that the certificate is the symbol of the right.

In the case of Neal v. Bartleson, 65 Texas, 482, the question was as to the jurisdiction of a probate court in this State to grant letters of guardianship of the estate of nonresident minors. The only property in this State upon which such jurisdiction could rest was a right, which the ancestor of the minors had acquired and which they had inherited, to obtain a certificate for a league and labor of land. Of this Judge Stayton, in sustaining the jurisdiction, used this language: "Under the proof made in the case, it must be conceded that the parents of the appellees were entitled to a land certificate for a league and labor of land. 'This right, though neither real nor personal property *in esse,* was, nevertheless, an inchoate right to get that quantity of land out of some part of the public domain.' Johnson v. Newman, 43 Texas, 639, and cases cited. To perfect this right, and to make it assume the character of personal or real property, tangible, it was necessary that the steps required by law be taken, and a land certificate, the evidence of the right, be obtained. The right, imperfect as it was, was property which their ancestor might have sold, and it would seem that such a right, if vested in a minor, would be assets belonging to his estate and subject to administration through a guardianship. Such a right would peculiarly need the attention of someone, that it might be perfected. That attention would necessarily have to be bestowed here; for the laws in force here must be observed, otherwise the right could never assume the perfect shape of property, personal or real. The tribunals provided by the laws of this State, would alone have power to adjudicate the claim, and to furnish the complete evidence of the right, which, of itself, has often been held to be property subject to sale under administration. The right necessarily had its situs here, as fully as has land here. It had its existence only by force of the laws of this State, and could never be made effective save through their operation."

While this is significant and goes far to sustain the view expressed by us, it does not fully cover the present question. The actual situs in Texas of any personal property might be sufficient to sustain the jurisdiction of our courts to subject it to debts and other purposes of administration, while questions as to the devolution of title to it might be controlled by the law of the domicile of the owner. But when we consider the nature of land certificates and how directly titles to lands depend on the ownership of them, we can entertain no doubt, under the principles governing the subject, that such ownership should be held to be controlled by our own laws. Such a certificate is "the obligation of the government entitling the owner of it to secure the designated quantity of land by following the requirements of the law" (Cox v. Bray, 28 Texas, 261), but the *title to the land* ordinarily depends upon and follows the title to the certificate and the ownership of the certificate constitutes title to land. The title to its land is the very subject which every sovereignty maintains the exclusive right to control by its own laws. "A sovereignty can not safely permit the

title to its land to be determined by a foreign power.  Each State has its fundamental policy as to the tenure of land; a policy wrought up in its history, familiar to its population, incorporated with its institutions, suitable to its soil."  (Wharton, Conflict of Laws, p. 636, sec. 278.)  This consideration of policy must necessarily govern the descent of the title to land certificates issued under the laws of Texas, since they constitute the foundation of the titles to a very large part of the lands in the State.

This does not conflict with the decisions which hold that the certificates, for many purposes, are to be regarded as chattels.  Those decisions apply the law of this, not that of another, State.  The mere fact that, for some purposes of our own, we treat such evidences of right as chattels does not justify the application to them of the principle that the title to movables is controlled by the law of the domicile of the owner, when the effect would be to subject titles to land in this State to a foreign law.  That principle is generally, but not universally, true.  It is not allowed to have the effect just stated.  In some jurisdictions mortgages upon, and some leasehold interests in, real estate are regarded by the local law as chattel interests but that is not allowed to subject them to a foreign law of the owner's domicile.  Wharton, p. 640, sec. 287, and cases cited.

As stated in Neal v. Bartleson, inchoate rights such as that first granted to Wallace had to be followed up by a compliance with our own laws in order to realize, by the acquisition of land, the only reward promised.  They had to be prosecuted here and had their situs here.  They were subject throughout to the operation of our laws.  They pertained to, and were finally satisfied in the acquisition of, land, and their nature, and not the mere temporary character which, at times, the evidence of them assumed, is to be regarded in determining such a question as this.  The confusion and inconvenience that might result from the application of foreign laws, depending upon the domiciles of all those to whom such right were granted, could hardly be overstated.  The officers of the government and the people dealing with such matters must necessarily, in determining questions of heirship and the like, have followed the laws of this sovereignty "familiar to its population," since they were dealing with the titles to lands situated here and were required to take notice of no other laws.  We are unwilling to introduce this additional uncertainty into our land system.  The judgment is right and will be affirmed.

*Affirmed.*