## RICHARDSON et al. v. TEMPLE LUMBER CO.

### No. 2119.

Court of Civil Appeals of Texas. Beaumont.
Jan. 13, 1932.

Rehearing Denied Feb. 17, 1932.

W. D. Gordon, of Beaumont, J. T. Adams, of Orange, and Adams & Hamilton, of Jasper, for appellants.

Garland Smith and Lewis Lanier, both of Jasper, Kennerly, Williams, Lee, Hill & Sears, of Houston, R. E. Minton, of Lufkin, Baker, Botts, Parker & Garwood, of Houston, and Sleeper, Boynton & Kendall, of Waco, for appellee.

738

WALKER, J.

This was an action in trespass to try title, filed the 26th day of August, 1930, by the heirs of Cynthia C. Frazier against Temple Lumber Company, involving a tract of 640 acres of land in Jasper county, patented to Cynthia C. Frazier on the 8th day of March, 1848. Temple Lumber Company answered by general demurrer, general denial, pleas of not guilty, and the several statutes of limitations, and by cross-action in trespass to try title, pleading specially the several statutes of limitations, also by pleas over against its warrantors. Appropriate answers were filed by the warrantors to this cross-action. The trial was to a jury with judgment in favor of Temple Lumber Company upon an instructed verdict. Judgment was also entered in favor of the warrantors. The appeal is by the plaintiffs in the lower court.

The facts are as follows: On June 7, 1841, unconditional certificate No. 537 for 1,280 acres of land was issued to Cynthia C. Frazier, which, with the indorsements on the back thereof, was as follows:

"Republic of Texas, County of Jasper
No. 537
"This is to certify that Cynthia C. Frazier has proved before us, the Board of Land Commissioners for the County of Jasper, that she emigrated to this Republic in the month of July, 1837, and that she is the head of a family, and that she has never received a conditional certificate for the quantum of land for which she now applies, and that she is entitled to an unconditional grant of twelve hundred and eighty acres of land agreeable to an Act of Congress approved January 15th, 1841.

"Given under our hands at the town of Jasper this 7th day of June, A. D. 1841.
"M. B. Lewis, Chief Justice and
Ex officio Pres't Board Land Comm.
"Attest:
"C. K. Blanchard,
"Clk. Co. Court and Exofficio Clk. B. L. Comm'rs."

The following indorsements, as certified by the Commissioner's General Land Office, September 24, 1930, were indorsed on back of same:

"Republic of Texas, County of Jasper.
"I certify to have surveyed on the within certificate Six Hundred and Forty acres of land situated between the surveys of Andrew Montgomery & Washington C. Frazier on the East bank of the Neches River.
"Given under my hand, this 14th June, 1844.
"M. B. Lewis, Práctical Surveyor.

"Cynthia C. Frazier uncondit'l certificate 2nd Clk. Balance 640 acres land. File 37. Jasper Co. 2nd Clss. Uncondit'l certificate Cynthia C. Frazier, 1280 acres. Cynthia C. Frazier, Cert. No. 537, 1280 acres. Written across face of instrument: 'registered and approved, July 29, 1838, Edward Clark, Comm'r. of Claims.'"

The Cynthia C. Frazier survey, surveyed under this certificate on the 14th day of June, 1844, was described as follows by the surveyor in the return made by him of his work:

"Survey for Cynthia C. Frazier Six Hundred and Forty acres of land situated on the East bank of the Neches River, between the surveys of Andrew Montgomery and Washington C. Frazier, being a part of the quantity of land which she is entitled by virtue of Certificate No. 537 issued by the Board of Land Commissioners for the County of Jasper." (Here follows a specific description by metes and bounds of the 640 acres, identified as the land in controversy, with calls for course and distance and its locating corners.)

The record shows that on April 30, 1844, Cynthia C. Frazier was the wife of Joshua Hickman, and on that date, joined by her husband, she executed the following deed to Moses K. Thomason:

"The Republic of Texas
"Know all men by these presents, that we Joshuway Hickman and Cynthia C. Hickman husband and wife of the County of Jasper in the Republic aforesaid in consideration of the sum of three hundred dollars to us paid by Moses K. Thomason of the same County and Republic, have granted, bargained, sold and released and by these presents do on this thirtieth day of April, A. D. 1844, grant, bargain, sell and release unto the said Moses K. Thomason all of our right, title, interest, claim and demand in and to the following described tract of land, situated on the east side of the Neches River between the survey of Andrew Montgomery above and Washington C. Frazier below, containing six hundred and forty acres of land, more or less. Together with all and singular the rights, members, hereditaments and appurtenances to the same belonging or in anywise incident appertaining; to have and to hold all and singular the premises above mentioned unto the said Moses K. Thomason, his heirs and assigns forever and we do hereby bind ourselves, our heirs, executors and administrators to warrant and forever defend all and singular the said premises unto the said Thomason, his heirs and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof, and further we have and do on the day and date aforesaid, made, constituted and appointed the said Moses K. Thomason our true and lawful agent or attorney in fact, giving and granting to him, said Thomason, full power and lawful authority to sell, alienate, convey and donate the same or any part thereof and to exercise all rights and privileges of ownership over the same that we could or ought to of done had we not dispossessed ourself of the same by this our bona fide sale and power of attorney.

"Hereby ratifying and confirming all and singular the acts of our said attorney and all the stipulations in the aforesaid deed.

"Given under our hands and seals this the day and date aforesaid.

His
Joshua X Hickman [Seal.]
Mark
Cynthia C. Hickman [Seal.]

"M. B. Lewis,
"Jesse Laird,
"Z. Wms. Eddy.

"Republic of Texas, County of Jasper.

"Be it known that on this thirtieth day of April, 1844, personally came Joshua Hickman and Cynthia C. Hickman the assignors of the foregoing deed and power of attorney before me M. B. Lewis, Chief Justice of the County aforesaid and acknowledged their signatures to the same to be their voluntary act and deed for the use and purpose therein contained.

"Given under my hand and seal of office this day and date aforesaid.

"M. B. Lewis,
"C. J. J. C., C. & Ex'ff. Not. Pub.
"Filed for record the 6 Feb. A. D. 1845."

This original instrument was brought from the General Land Office and offered in evidence. On the back of same was written in ink the following:

"I do hereby certify that the within is the certificate and Headright of Cynthia Frazier, Jasper County, September 24, 1844.
"Cynthia C. Frazier.
"John Frazier."

John Frazier, the witness to Cynthia's transfer of her certificate, was her father, and was, at or about that time, county and district clerk of Jasper county. The date of Cynthia's marriage to Hickman was not shown, but appellant Amos Richardson, Cynthia's son by her subsequent marriage to John Richardson, testified that one son, Gus Hickman, was born to his mother and her husband, Joshua Hickman. He thought Gus was born in 1832, but the tombstone at the grave of Gus Hickman shows that he was born May 1, 1842. As above stated, the Cynthia C. Frazier survey of 640 acres, involved in this suit, was surveyed on the 14th day of June, 1844, and, as surveyed, was situated between the surveys of Andrew Montgomery and Washington C. Frazier. Under execution against Moses K. Thomason, issued out of precinct No. 1, Jasper county, the sheriff of Jasper county, on the 2d day of July, 1844, conveyed this 640 acres to Jesse Laird. It was agreed that the justice court dockets and all other books and records of justice precincts Nos. 1 and 2 of Jasper county, as they existed on the 2d day of July, 1844, and April 6, 1852, had been lost or destroyed. Cynthia C. Frazier or "Widow Hickman" and John Richardson were married on the 27th day of October, 1849. The records of Jasper county were burned two

days later. On the 1st day of November, 1850, Cynthia C. Frazier conveyed by her deed in writing to Jesse Laird the 640 acres of land in controversy. This deed was witnessed by her husband, John Richardson, and a second witness, William Richardson. John Richardson, Cynthia's husband, did not join in the execution of the deed. This deed, together with the patent and the deed by Jesse Laird, by sheriff, to John Blewett, was recorded on the 6th day of January, 1854.

Appellants claimed as heirs of Cynthia C. Frazier. Appellee deraigned title to the 640 acres by regular chain of title under Moses K. Thomason. Twenty-four or more deeds were in appellee's chain of title, all of which were duly filed for record and duly recorded in the records of Jasper county. Appellee and those under whom it holds assessed the 640 acres of land for taxes from and including the year 1846 to and including the year 1929. Jesse Laird assessed the taxes for the years 1846, 1847, 1848, 1849, and 1850. Quoting from appellee's brief, "it also showed that with the exception of a few years this land was assessed for taxes with the record owners for each and every year from 1852 to 1929. This statement (referring to the certificate of the State Comptroller) does not show the assessment of this land by anyone of the appellants or anyone purporting to be an heir or as representing the heirs of Cynthia C. Frazier. * * * It is also shown by the tax records of Jasper County that no delinquent taxes were assessed against this land. It was also agreed that since 1906 appellee and those under whom it holds title, have paid all taxes on this land to the date of the trial." The judgment is dated the 17th day of December, 1930. Appellant Amos Richardson, the son of John and Cynthia Richardson, was born March 5, 1854, and testified that he had lived in Jasper county practically all his life. The other appellants have lived most of their lives in Jasper and adjoining counties. Under the evidence, the appellants at no time until shortly prior to the institution of this suit asserted any claim to this land. The evidence showed that one of appellee's grantors paid $16,275 in cash for this tract of land, and that, at the time he made this purchase, he had no knowledge that on the 1st day of November, 1850, when Cynthia Frazier conveyed this land to Jesse Laird, she was married to John Richardson.

## Opinion.

The first question in this case is the nature of a land certificate, as construed under the following provisions of the Act of January 20, 1840, 2 Gammel's Laws, pp. 177, 178, adopting the common law:

"Sec. 3. Be it further enacted, that neither the lands nor slaves which the wife may own, or to which she may have any right, title or claim at the time of her marriage, nor the

lands nor slaves to which she may acquire, during the coverture, any right, title or claim, by gift, devise or descent, nor the increase of such slaves in each case, nor the paraphernalia as defined at Common Law, which the wife may have at the time 'of the marriage, or which she may acquire during the coverture as' aforesaid, shall, by virtue of the marriage, become the property of the husband, but shall remain the' separate property of the wife; Provided, however, That during the continuance of the marriage, the husband shall have the sole management of such lands and slaves.

"Sec. 4. Be it further enacted, that all property which the husband or wife may bring into the marriage except land and slaves and the wife's paraphernalia, and all the property acquired during the marriage, except such land or slaves, or their increase, as may be acquired by either party, by gift, devise or descent, and except also the wife's paraphernalia, acquired as aforesaid, and during the time aforesaid, shall be the common property of the husband and wife, and during the coverture may be sold or otherwise disposed of by the husband only."

Under this law appellants insist that land certificates were "lands" or "right, title or claim" to lands, within the provisions of section 3; while appellee insists that land certificates, under this law, were merely personal property and constituted a part of "the common property" of the marriage, and were not classed within the exceptions saved to the wife, as her separate property, under the provisions of section 3.

 Our Supreme Court has construed land certificates both as personal property and as real property; the issue being determined by the nature of the question before the court. Thus, in Waterman v. Charlton. 102 Tex. 510, 120 S. W. 171, 173, the Supreme Court said, "The ownership of the certificate constitutes title to land." But in that case, recognizing that land certificates may also constitute personal property, the court said:

"The opposite view is based upon decisions of this court which treat unlocated land certificates as being in themselves personal property, or chattels. Undoubtedly they have been so treated for many purposes. Assignments or transfers of them have not been required to be in writing. Cox v. Bray, 28 Tex. 247. In probate proceedings the laws governing the sale of personal property have been held to be applicable, rather than those concerning sales of land. East v. Dugan, 79 Tex. 330, 15 S. W. 273. The provisions of law for the registration of land titles have been held not to apply to instruments assigning certificates. Shifflet v. Morelle, 68 Tex. 389, 4 S. W. 843. They can be wrongfully converted so as to subject the wrongdoer to an action for their value. Nelson v. King, 25 Tex. 664; Barker v. Swenson, 66 Tex. 408, 1 S. W. 117. In the distribution of estates under the laws of this state, they have been treated as descending as personal property. Porter v. Burnett, 60 Tex. 220; Harvey v. Cummings, 68 Tex. 605, 5 S. W. 513; Harvey v. Carroll, 72 Tex. 65, 10 S. W. 334."

In that case the Supreme Court sustained its ruling that "the ownership of the certificate constitutes title to land," on the ground of public policy, in order to support the rule that title 'to land certificates, forming the basis of the title to land, descends to the heirs of the holder of the certificate, under the laws of Texas and not under the laws of a foreign jurisdiction. The court said:

"The title to its land is the very subject which every sovereignty maintains the exclusive right to control by its own laws. 'A sovereignty cannot safely permit the title to its land to be determined by a foreign power. Each state has its fundamental policy as to the tenure of land; a policy wrought up in its history, familiar to its population, incorporated with its institutions, suitable to its soil.' Wharton, Conflict of Laws, p. 636, § 278."

As authority for its proposition that public policy will support the rule that, for certain purposes, personal property may be considered as partaking of the nature of real property, the court said:

"In some jurisdictions mortgages upon, and some leasehold interests in, real estate are regarded by the local laws as chattel interests; but that is not allowed to subject them to a foreign law of the owner's domicile. Wharton, p. 640, § 287, and cases cited."

Applying this proposition to land certificates, the court said:

"In the decision of such questions as that before us, the laws which authorized the issuance of evidences of right to acquire land should be regarded as if they were grants of the land ultimately acquired. * * *

"This consideration of policy must necessarily govern the descent of the title to land certificates issued under the laws of Texas, since they constitute the foundation of the titles to a very large part of the lands in the state."

But, immediately in connection with this construction of land certificates and as a part of its opinion in Waterman v. Charlton, the Supreme Court was careful to say that it was not in conflict with any decision theretofore rendered construing these certificates as personal property. As we construe that case, the Supreme Court recognized that, in the decision of domestic questions, that is, where only the laws of this state are involved, land certificates should be construed strictly as personal property to be held, sold, and devised as personal property, under the laws of this state, governing personal property; but, where a conflict arises between the laws

of Texas and a foreign jurisdiction, governing the descent of certificates, of a nature to affect the title to lands in Texas, they should be construed as real property and be governed by the laws of this state regulating the title to real property. On this analysis, Waterman v. Charlton passes out of this case, and cannot aid us in construing the Act of January 20, 1840, because this case involves no issue of public policy.

■ Now, under the principles just stated, was it the intent of the Congress of the republic to include land certificates in the terms "lands" and "right, title or claim" to land, saved to the wife as her separate property within the provisions of section 3? We think the language of sections 3 and 4 is unambiguous, and by its terms made land certificates the common property of the marriage. Under the authorities reviewed by the Supreme Court in Waterman v. Charlton, a land certificate, under the local law and for domestic purposes, was personal property, and, whether owned by the husband and wife before marriage or acquired by them during marriage, became, under the law of January 20, 1840, a part of the common property. We say this because there is nothing in this act to suggest that the terms "lands" and "right, title or claim" to land were intended to include any character of personal property. Specific personal property was named in section 3, and by thus including this specific property all other personal property was affirmatively excluded. On this issue, in Arnold v. Leonard, 114 Tex. 539, 273 S. W. 799, 801, the court said:

"Prior to the adoption of the Constitution of 1845, the wife's separate property had been so defined by the act approved January 20, 1840 (Acts 1840, p. 30) as to include the lands and slaves owned or claimed by the wife at the time of her marriage and the land and slaves acquired by her during coverture by gift, devise, or descent, together with the increase of such slaves, and her paraphernalia.

"It is undeniable that under the act of 1840 all property other than that specifically defined as separate property of the wife was intended to belong to the separate estate of the husband or to become common property of the husband and wife. Such is the express provision of the act. Section 19 of Article 7 of the Constitution of 1845 was essentially an enlargement of the wife's separate estate. Under the act of 1840 all the wife's right to personal property passed to the husband, with the solitary exception of slaves and their increase. Owen v. Tankersley, 12 Tex. 407; Section 66, Speer's Law of Marital Rights in Texas; 30 C. J. 530, § 52c."

Unless clearly a different meaning is manifest from the language of this act, section 4 saved to the husband and wife, as their separate property, only their "land" and certain specific personal property enumerated to the wife. Nothing was said in section 4 about "right, title or claim" to land, and there being no language in the act requiring us to read into this term any property not commonly embraced in the term "land," the language of the act expressly excluded land certificates. In reaching this conclusion, we have kept in mind the fact that section 3 saved to the wife both her "lands" and her "right, title or claim" to land. We recognize that this language must be given some meaning, that it was not intended to use "right, title or claim" to land as synonymous with "lands." It is our conclusion that section 3 saved to the married woman the "right, title or claim" to land, in order that she might hold not only all land to which she owned a fee-simple title, but also all land to which she had any claim whatever, whether legal or equitable, leasehold, remainder, reversion, etc. It was not the intention of the Congress to save to her an entirely different class of property, recognized by the jurisprudence of the republic as personal property. This exact question, as it relates to the construction of land certificates, within the provisions of sections 3 and 4, has been judicially answered. In Phillips v. Palmer, 56 Tex. Civ. App. 91, 120 S. W. 911, 913, reported a second time in (Tex. Civ. App.) 169 S. W. 1117, the certificate was owned by the husband. It was an issue of fact whether he acquired the certificate before or during marriage. Citing section 4, on the issue of title to the certificate, the court said:

"If the parties were not man and wife when the certificate issued, if it had not ceased to be personal property, by its location, when they married, it became then community property, and when located the land belonged to the community."

In Whisler v. Cornelius, 34 Tex. Civ. App. 511, 79 S. W. 360, 361 (writ refused), the same issue was before the court; that is, the title to a land certificate acquired by the husband before marriage. Holding it was personal property, and under section 4 became a part of the community property, the court said:

"If the certificate in question had not been issued before the marriage or death of the said John Whisler, still the right to it had been acquired before either of such events, and upon his marriage became a community right of himself and wife, or, if issued before his marriage or death, it was personal property."

As holding against this construction, appellants cite Welder v. Lambert, 91 Tex. 510, 44 S. W. 281, and Laufer v. Powell, 30 Tex. Civ. App. 604, 71 S. W. 549, 554. That the Supreme Court did not construe these two cases as in conflict with Whisler v. Cornelius, and Phillips v. Palmer is manifested by the fact that the writ was refused in Laufer v. Powell on the 13th day of February, 1903, and the opinion was rendered in Welder v. Lambert on the 7th day of February, 1898,

while the writ was not refused in Whisler v. Cornelius until the 7th day of April, 1904, and on the second report of Phillips v. Palmer, the 9th day of June, 1915. But, upon a careful analysis of appellants' cases, we find no conflict. Welder v. Lambert in no way involved a construction of the Act of January 20, 1840. As shown by the facts of that case, the land in controversy was granted on the 12th day of October, 1834, under a colonization contract dated the 11th day of June, 1828. Laufer v. Powell, in the original opinion, was decided upon grounds independent of this act. The appellees claimed by heirship through Mrs. Hemphill. On rehearing, the court discussed Mrs. Hemphill's interest in the Welschmeyer land and determined, as a fact, to quote from the opinion, that "Mrs. Hemphill never owned any interest in the Welschmeyer land." After making this fact finding, which affirmatively disposed of the case on a theory not involved in the original opinion, the court proceeded to discuss the character of her title to the Welschmeyer land, assuming for this purpose that she had an interest therein. On this theory the court found that her interest, if she had any, accrued to her under the Constitution of 1845, which made this land her separate property, and through her the appellees inherited the land, making the third theory of law in support of appellees' title. Mrs. Hemphill, as the widow of Andrews, married Welschmeyer in 1837, who died in 1839. About 1841 she married Hemphill. She died in 1847, leaving her husband and her daughter, appellee Mrs. Powell, surviving her. Again, assuming against the facts, and only for the purpose of argument, that Mrs. Hemphill owned an interest in the league and labor of land to which her former husband, Welschmeyer, was entitled under the law, the court, by the fourth proposition, involving a construction of the Act of January 20, 1840, held that this interest was her separate property.

"By reason of his compliance with the law regulating such matters, Welschmeyer was entitled to obtain from the government a league and labor of land. That was a claim to land. It had been approved by one board and rejected by another, when appeal was made to the legislature, and that body recognized the claim as just, and provided for its satisfaction by directing the issuance of a certificate for a league and labor of land. But the claim existed before that certificate was issued, and, being a claim for land, Mrs. Hemphill's interest therein was controlled by the third section of the statute, and was her separate property."

If this proposition is in point in support of appellants' construction of section 3 of this act, we do not think it should control this case, because it was pure dicta, and so recognized by the Supreme Court by its subsequent refusal of the writ of error in Whisler v. Cornelius.

The next question is whether or not the certificate, forming the basis of the title to the land in controversy, had been located on this land on April 30, 1844, prior to the date of the Thomason deed. As shown by the indorsement on the back of the certificate, the land appropriated under the certificate was not surveyed until the 14th day of June, 1844, which was subsequent to the date of the deed to Thomason. While it is true that the Thomason deed contained a general description of the land in controversy, that fact, on the record before us, meant only that Cynthia and her husband had merely selected this land for appropriation under the certificate; but the intention on their part to appropriate the land did not constitute a location of the certificate. The selection was not binding upon them, and they could have abandoned it and selected and had surveyed an entirely different tract of land. In Hollingsworth v. Holshousen, 17 Tex. 41, the court said:

"Where nothing appears in respect to any location anterior in date to the survey, that must be taken to be the inception of the title."

See, also, Lewis v. Durst, 10 Tex. 398.

On the facts, construed by these authorities, we conclude that at the date of the Thomason deed the certificate had not been located upon and merged into the land in controversy, but on that date retained its original character as personal property and was made by section 4 of the Act of January 20, 1840, the common property of the marriage, and, under this section, could be sold only by the husband.

Finally, as the certificate was personal property and had not been located, did the Thomason deed have the effect of conveying title of the certificate to Thomason? This question should be answered in the affirmative. The sale of the certificate was purely a question of intention. If, in making the deed to Thomason, it was the intention of Joshua Hickman and his wife to convey him the title to the certificate, then, under the authorities, the title passed. Santana Live-Stock & Land Co. v. Pendleton (C. C. A.) 81 F. 784. In Robertson v. Du Bose, 76 Tex. 1, 13 S. W. 300, 302, the Supreme Court said:

"If it is evident, from the conveyance, that it is intended to convey whatever land the certificate is applied to, that is all that is required."

The fact that Joshua and his wife conveyed this land to Thomason, and on the back thereof Cynthia made the following indorsement: "I do hereby certify that the within is the certificate and Headright of Cynthia Frazier, Jasper County, September 24, 1844" —brings this case, on the question of intent, within the rule announced by Robertson v.

Du Bose. The facts of the two cases are almost on all fours. On the issue of proof of intent the court said:

"The one certain thing in the instrument, so far as the subject-matter of the conveyance is concerned, is that it is his own head-right claim for one-third of a league of land that Caleb Holloway is selling and conveying. Whatever imperfections of description of the subject-matter of the conveyance may exist in other respects, there is no doubt about it in this, the only essential, particular."

Appellants would strike down this Thomason deed because defectively acknowledged by Mrs. Hickman. But, as the deed conveyed only the certificate, which was personal property, and not the land described in the deed, and as Hickman alone had power to sell the certificate, it was not necessary for Mrs. Hickman to join in its execution, and therefore that her acknowledgment was fatally defective in no way impaired the legal effect of the deed to convey the certificate to Thomason.

Appellee would also sustain its judgment on a theory of estoppel and of limitation, under chapter 30 of the Acts 41 St. Leg. (1930), 5th Called Sess. We have given these contentions very careful consideration, and have concluded they are without merit. We do not discuss them in relation to the facts and law because we think the judgment should be affirmed for the reasons above stated.

Affirmed.