

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-22-00437-CV

———————————————————

KELLY M. TENEYCK, Appellant

V.

RONALD W. TENEYCK, Appellee

On Appeal from the 393rd District Court
Denton County, Texas
Trial Court No. 20-10161-393

Before Kerr, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

In this appeal from the trial court's final divorce decree, appellant Kelly M. Teneyck (Kelly) asserts five issues. In three issues, she contends that the trial court abused its discretion by ordering the parties to equally share possession of their children, awarding $1.3 million in separate property to appellee Ron W. Teneyck (Ron), and finding that Kelly waived her reimbursement claim. In two issues, she contends that the trial court committed reversible error by failing to file certain findings of fact and conclusions of law. We conclude that the trial court did not abuse its discretion in its possession order and characterization of Ron's separate property, and it did not find that Kelly waived her reimbursement claim. We further conclude that any error in the trial court's failure to file additional findings of fact and conclusions of law was harmless. Accordingly, we affirm the final divorce decree.

## I. Background

Kelly and Ron met and began living together in 2012. Two years later, their first child, B.M.T., was born. The family moved to Texas and purchased a house in The Colony a year later. The couple married on May 23, 2016, and their second child, B.O.T., was born in 2017.

Ron filed a petition for divorce in December 2020 in which he also sought joint managing conservatorship of the children and a property division. Kelly answered and filed a counterpetition for divorce.

The trial court held a bench trial at which Kelly and Ron testified. Although Kelly previously had representation, she was pro se at trial. After closing arguments, the trial court announced its ruling that the parties were divorced and that it was ordering a joint managing conservatorship with Kelly's having the right to designate the children's residence and a "50/50" possession schedule, instead of a standard possession order. *Compare* Tex. Fam. Code Ann. §§ 153.3101–.3171 (standard possession), *with id.* § 153.133 (parenting plan for joint managing conservatorship). The trial court found that the marital residence, Ron's stock shares, and life-insurance policies were Ron's separate property. The trial court noted that Ron had stipulated to a community-property reimbursement for funds spent on the residential mortgage, although Kelly did not plead it, and the trial court awarded a $63,728.81 reimbursement. The trial court issued a written final divorce decree reflecting these rulings.

Kelly timely sought findings of fact and conclusions of law under Texas Rule of Civil Procedure 296. When the trial court did not file findings and conclusions, Kelly filed a timely notice of past due findings and conclusions. The trial court filed findings and conclusions four days later, and Kelly filed a timely request for additional and amended findings and conclusions under Rule 298. The trial court filed supplemental findings and conclusions, and this appeal followed.

## II. Standards of Review

The trial court is vested with broad discretion in making decisions on custody, control, possession, and visitation, and we review such decisions for an abuse of

3

discretion. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *C.W. v. B.W.*, No. 02-19-00270-CV, 2020 WL 4517325, at *2 (Tex. App.—Fort Worth Aug. 6, 2020, no pet.) (mem. op.). We also review a trial court's alleged property characterization error for an abuse of discretion. *Boyd v. Boyd*, 131 S.W.3d 605, 617 (Tex. App.—Fort Worth 2004, no pet.).

A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

A trial court also abuses its discretion by ruling without supporting evidence. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012). But it does not abuse its discretion if it decides based on conflicting evidence, so long as some substantive and probative evidence supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002) (op. on reh'g).

In family-law cases, the traditional sufficiency standards of review overlap with the abuse-of-discretion standard of review; therefore, legal and factual insufficiency are not independent grounds of error but are relevant factors in our abuse-of-discretion assessment. *Neyland v. Raymond*, 324 S.W.3d 646, 649 (Tex. App.—Fort Worth 2010, no

4

pet.). To determine whether a trial court has abused its discretion because the evidence is legally or factually insufficient to support the decision, we must determine (1) whether the trial court had sufficient evidence upon which to exercise its discretion and (2) whether the trial court erred when it applied that discretion. *Id.*

In determining the first question, we apply the same standards of review to a trial court's findings of fact that we apply to a jury's answers to questions in the court's charge. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). Evidence is legally insufficient to support a finding only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). In determining legal sufficiency, we must consider evidence favorable to the finding if a reasonable factfinder could, and we must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn*, 554 S.W.3d at 658 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the evidence in the record pertinent to that finding, we determine that the credible evidence

5

supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

When the burden of proof at trial is by clear and convincing evidence, as it is for establishing that property is separate from the community, *see* Tex. Fam. Code Ann. § 3.003(b), we apply a higher standard of legal and factual sufficiency review. *Boyd*, 131 S.W.3d at 611. "Clear and convincing evidence" is defined as that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Boyd*, 131 S.W.3d at 611.

### III. Analysis

**A. The Possession Order**

In her third issue,[1] Kelly contends the evidence is insufficient to support the trial court's 50/50 possession order. She also contends that the trial court's possession order is "inherently arbitrary" because it was issued "without the guidance of the required child custody report."

---

[1]We address Kelly's issues out of order for simplicity.

## 1. Sufficiency of the Evidence

"Suits affecting the parent-child relationship are intensely fact driven, which is why courts have developed best-interest tests that consider and balance numerous factors." *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002). "The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." Tex. Fam. Code Ann. § 153.002. "The standard possession order is presumably in the child's best interest, but that presumption is rebuttable." *In re E.D.*, No. 02-20-00208-CV, 2022 WL 60781, at *12 (Tex. App.—Fort Worth Jan. 6, 2022, no pet.) (mem. op.) (citing Tex. Fam. Code Ann. § 153.252).

The policy is "to encourage frequent contact between a child and each parent for periods of possession that optimize the development of a close and continuing relationship between each parent and child." Tex. Fam. Code Ann. § 153.251(b). A trial court has discretion to determine the best interest of the child when establishing terms and conditions of conservatorship. *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021). "A trial court is 'in the best position to observe the witnesses and their demeanor, and therefore is given great latitude in determining a child's best interests.'" *In re E.S.*, No. 02-20-00407-CV, 2021 WL 2149627, at *7 (Tex. App.—Fort Worth May 27, 2021, pet. denied) (mem. op.) (quoting *In re Guardianship of C.E.M.-K.*, 341 S.W.3d 68, 80 (Tex. App.—San Antonio 2011, pet. denied)). A 50/50 possession schedule may be in a child's best interest. *See, e.g.*, *In re S.H.*, No. 02-15-00360-CV, 2017 WL 2871682, at

*8 (Tex. App.—Fort Worth July 6, 2017, no pet.) (mem. op.) ("[W]e cannot say that the trial court abused its discretion in determining that a week-on, week-off possession schedule was in [the child's] best interest.").

The Supreme Court of Texas has identified factors that courts may consider when determining the best interest of a child, including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by the individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent–child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This is not an exhaustive list, and a court need not have evidence on every factor listed to make a valid finding as to the child's best interest. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The Texas Family Code sets out similar factors for a court to consider when deviating from the standard possession order: (1) the age, developmental status, circumstances, needs, and best interest of the child; (2) the circumstances of the managing conservator and of the parent named as a possessory conservator; and (3) any other relevant factor. Tex. Fam. Code Ann. § 153.256.

Kelly contends that little best-interest evidence was offered at trial and that evidence of Kelly's and Ron's "parental abilities" was "scant." But she points to three pieces of evidence to show that the 50/50 schedule was not in the children's best interests. First, as evidence of the physical danger posed to the children, Kelly cites drug tests and testimony purportedly reflecting that Ron had a "documented history of drug and alcohol abuse" and that he "tested positive for marijuana twice during the proceedings." The results of the drug tests, however, were not admitted at trial. Thus, they are not part of our analysis. Regardless, the cited drug-test reports reflected in the record show that Kelly took and *failed* two drug tests, testing positive for cannabinoids and THC,[2] while Ron took and *passed* three drug tests. Ron admitted at trial that certain concerns had been raised about whether he abused alcohol or drugs. The record further reflects that Ron denied drug use and complied with the trial court's order for alcohol-use monitoring. Ron's alcohol-use report admitted at trial showed 633 compliant tests and 0 non-compliant tests. He further testified that he does not drink and become intoxicated when with the children.

Kelly next cites evidence to show that Ron did not know B.M.T.'s age at trial and had to be corrected by his attorney. The cited testimony, however, reflects that Ron

---

[2]"THC is an abbreviation for tetrahydrocannabinol, which is marijuana's active ingredient." *In re J.B.*, No. 02-22-00384-CV, 2023 WL 1859766, at *1 n.7 (Tex. App.— Fort Worth Feb. 9, 2023, pet. denied) (mem. op.).

corrected his own answer. When asked, "How old is [B.M.T.]?" Ron answered, "[B.O.T.] is 7 and [B.M.T.] -- [B.M.T.] is 7. [B.O.T] is 4."

Finally, Kelly cites evidence that Ron "did not know about B.M.T.'s educational plan, the 504 plan Kelly handled with the school." Kelly cites the following exchange from her cross-examination of Ron:

> Q. What plan is [B.M.T.] on for extra help for the schooling that will follow her through until college?
>
> A. Well, this is the first meeting of this year, which is the 26th. We're going to meet and we're going to find out what the plan is going to be. We have not yet met with any of the teachers or principals yet this year about how we're going to address [B.M.T.].

Kelly responded, "[B.M.T.] was put on [a] 504 plan in kindergarten and it follows her through college. It doesn't stop. Just so you know." Ron was also unable to name B.M.T.'s special-education class but said that he had met the teacher. On redirect, he clarified that he had been involved in the children's "504 and ARD meetings at school" and B.M.T.'s individualized education plan, which was the topic of "the meeting on the 26th." He further testified that he had participated in all school meetings about which he was notified and that he "would change [his] schedule to make sure [he was] there."

We disagree that this evidence demonstrates that the 50/50 schedule is not in the children's best interests: some of the cited evidence does not reflect what Kelly contends and other evidence contradicts it. *See Coleman v. Coleman*, 109 S.W.3d 108, 111 (Tex. App.—Austin 2003, no pet.) ("The district court is the sole judge of the

weight and credibility of the evidence."). We also disagree that there is "scant" evidence of Kelly's and Ron's parenting abilities and the best-interest factors.

Ron cites his testimony as evidence rebutting the best-interest presumption favoring the standard possession order. Citing *Ragsdale v. Progressive Voters League* in her reply brief, Kelly contends this self-serving testimony does not rebut the presumption. *See* 801 S.W.2d 880, 882 (Tex. 1990) ("It is the general rule that the testimony of an interested witness, such as a party to the suit, though not contradicted, does no more than raise a fact issue to be determined by the jury."). She notes that she contradicted at least some of Ron's testimony. We must accept uncontradicted testimony as true unless it is "unreasonable, incredible, or its belief is questionable," in which case it merely raises a fact issue. *Id.*

At the trial's outset, Ron submitted to the trial court a proposed parenting plan seeking a 50/50 possession schedule. Kelly did not object, and the plan was admitted. Ron testified that such a schedule was in the children's best interests because he and Kelly were "extremely close" to their children, he had done "everything with [them] from the very beginning," he had not been apart from B.M.T. except for the period beginning with his separation from Kelly until the trial court issued temporary orders, and B.M.T. calls him her "BFF." Ron also testified that his proposed parenting plan would require the parents to live close enough to one another to have a "shared schedule." He further testified that he was not proposing a 50/50 possession schedule to avoid or reduce his child support obligation but that he had sufficient resources to

11

pay the maximum amount of child support and to support the children during his half of the possession schedule. Ron opined that the proposed schedule would also give Kelly the flexibility to seek employment and save money.

Ron further testified that the 50/50 possession schedule would mitigate the risk that the parent with greater access to the children would take advantage of the other. Ron alleged that this had happened under the court's temporary schedule. Ron said that Kelly had interfered with scheduled video calls with the children. He detailed one incident in which Kelly allegedly prevented the children from participating in a video call with Ron's sister, who was battling pancreatic cancer. According to Ron, Kelly's justification was that the children "will never see [Ron's sisters]." He also described a conflict in which Kelly insisted that Ron pick up B.M.T. from Kelly's house rather than the school. According to Ron, Kelly did so because he would not use the same parking spot as Kelly when picking up B.M.T. from school. Ron noted that under the temporary orders, his time with B.M.T. started when school let out, implying that Kelly was intruding on his time with B.M.T. Ron also testified about derogatory and threatening text and e-mail messages Kelly allegedly sent to Ron's employer during the divorce, noting that he had obtained a temporary injunction to prohibit Kelly from contacting his employer because of those communications.

Ron also testified that he participated in the children's healthcare "100 percent." He noted that the children had not seen a dentist, that both parents had been responsible for the children's dental care, and that the children would "be seeing the

12

dentist very soon." When asked about the children's vision exam, Ron detailed B.M.T.'s results, noting that she wanted glasses because they are "the fashionable thing" but that she does not need them. He did not know about B.O.T.'s results because Kelly allegedly withheld them from him. When questioned on cross-examination about whether he paid for the children's hearing, speech, and vision testing, Ron said that he had but that if Kelly did not receive any payment, he would "be more than happy" to pay. Kelly asserted in her cross-examination that Ron had canceled the family's health insurance, and Ron responded that he had not canceled the policy but that the insurance carrier had changed, something his employer controlled.

Kelly did not directly address Ron's proposed 50/50 schedule, but she testified that it was in the children's best interests for her "to have the [children]" because she had "always taken care of them, registered them, activities, [and] everything." She acknowledged that Ron "definitely loves his kids" but that, to her, "there is a difference between parenting and loving." She asserted that she had raised the children "from the beginning," "had them by [her] side," and "ha[d] done everything for them." After recounting her frustrations with Ron's allegedly failing to fulfill his promises, she testified that she wanted to "move on" and take the children "during school hours" to ensure that they complete their schoolwork. Kelly also testified that she volunteers at the "school system." She further asserted that she wanted Ron in the children's lives but that she needed him "to coparent and to listen and to be there." She ended her

direct testimony by saying, "I'm asking just for the 50/50, the kids 50/50, to do coparenting classes and to relocate and restart."

When asked where she planned to relocate, Kelly testified that she did not intend to leave the state but only wanted to move "outside the current neighborhood." Kelly testified on cross-examination that she hoped to open a restaurant after the divorce because she had experience in that business. She hoped to run the restaurant "and make things and do [her] own schedule with [her] girls." When asked why she had not worked in the 20 months since Ron filed his petition, Kelly said that Ron told her not to work because he had to travel. She also testified that Ron had refused to "help out on these days" if she did get a job.

She also addressed Ron's allegation that she prevented him from picking up B.M.T. from school. Kelly testified that B.M.T. got confused when Ron parked in a different location from the one that they had used for the previous three years. According to Kelly, Ron had started parking on the other side of the school. Kelly alleged that she had to search for B.M.T. when B.M.T. became confused about which parent was picking her up. Kelly testified that she was merely attempting to ensure that B.M.T. knew where to go after school regardless of which parent was picking her up.

After the close of evidence, the trial court asked Ron to explain why he requested a 50/50 schedule versus expanded visitation. Ron explained that both parties had completed coparenting classes but that the acrimony between them concerned him. He hoped that the 50/50 schedule would put the parties on "an equal playing field" and

14

mitigate the risk that the children would be "used as a weapon" against either party. He also reiterated that the maximum child support combined with the 50/50 schedule would relieve some of Kelly's financial burdens.

The trial court's findings and conclusions state that

- "[Ron] is a fit parent. [Ron] loves his children, spends time with his children and provides parental guidance to the children in a safe and suitable way."

- "[Kelly] is a fit parent. [Kelly] loves her children, spends time with the children, and provides guidance to the children in a safe and suitable way."

- "The divorce was an intense emotional experience for both parties where sometimes emotions resulted in inappropriate language and actions by both parties. However, [Kelly] engaged in some conduct that went beyond the norm for a contested divorce in contacting [Ron's] employer."

- "[I]t is in the best interests of the two children that each parent play a significant role in the children's lives and that there be an allocation of conservatorship duties where each parent has a significant role in making material decisions regarding the children. Accordingly, the possession schedule and allocation of conservatorship duties as set forth in the docket entries attached hereto as Exhibit A is appropriate."

The trial court's docket entry states that "[Kelly] and [Ron] [are] to have week on and week off possession during [the] school year" with the non-possessory parent to have "possession on Wednesday from time school is dismissed until 8:00 . . . p.m." The trial court stated in its supplemental findings and conclusions that the reasons for its possession order were adequately stated in its original findings and conclusions and

added that "the relationship between [Ron] and the children is illustrated by the pictures" admitted at trial. The pictures reflect Ron and the children eating and playing.

The record reflects sufficient evidence to support the trial court's finding that the 50/50 schedule is in the children's best interests. Specifically, the record reflects conflicts between the parties over scheduled visits under the temporary possession schedule, which used a phased approach culminating with a standard possession schedule. Although Kelly explained the conflict over picking up B.M.T. at school, she did not contradict Ron's allegation that she had interfered with his scheduled video calls with the children, and we may take Ron's allegation as true. *See Ragsdale*, 801 S.W.2d at 882. Despite their conflicts, both parties testified that they loved and cared for their children, spent significant time with them, wanted the other parent to maintain a close relationship with them, and exhibited a willingness to coparent. Additionally, there is evidence that the 50/50 schedule combined with Ron's child support would provide Kelly the flexibility to pursue employment opportunities. *See* Tex. Fam. Code Ann. § 153.256 (court may consider managing and possessory conservators' circumstances and "any other relevant factor" when deviating from the standard possession order).

We hold that the trial court had sufficient evidence upon which to order a 50/50 possession schedule and that it did not abuse its discretion in doing so. *See J.J.R.S.*, 627 S.W.3d at 218; *Neyland*, 324 S.W.3d at 649.

## 2. Child-Custody Report

Kelly also contends that the trial court's possession determination is arbitrary because the trial court did not wait for the psychological and custody evaluations that it had ordered in March 2021 with the parties' agreement. The record reflects that the psychologist assigned to do the evaluations notified the trial court in July 2021 that she had not conducted the parties' first interviews because they had failed to timely submit the necessary paperwork and could not agree on interview dates. The psychologist notified the court again in June 2022 that no evaluation had occurred because of the parties' "nonresponsiveness . . . to move forward" and that she had established September 1, 2022, as the deadline by which the parties were to update their paperwork and agree on interview dates. If the parties failed to comply, the psychologist said she would notify the trial court that the evaluations could not be completed "due to the parties' noncompliance." The record contains no additional correspondence from the psychologist, and trial was held on September 13, 2022. Citing Section 107.113 of the Family Code, Kelly contends that the trial court's failure to await the outcome of the psychological and custody evaluations renders the trial court's possession determination "inherently arbitrary." We disagree.

The Family Code does not require a trial court to order a custody evaluation or to await a custody-evaluation report. Rather, the trial court has discretion to order such an evaluation. Tex. Fam. Code Ann. § 107.103(a). Evaluators who conduct an evaluation must prepare a report. *Id.* § 107.113(a). But here, the psychologist did not

17

perform an evaluation because the parties failed to prepare the necessary paperwork and to agree on interview dates. Kelly cites no evidence reflecting any excuse or good-faith attempt to comply with the psychologist's requirements. Accordingly, the trial court did not act arbitrarily by issuing the possession order without waiting for a report that was plainly not forthcoming.

We overrule Kelly's third issue.

## B. The Property Characterization

In her fourth issue, Kelly contends that the trial court abused its discretion by awarding $1.3 million in separate property to Ron because he failed to prove his separate interest by clear and convincing evidence. Kelly takes issue with the separate-property characterization of three specific items: the marital residence, shareholder interests in RCP Fund I, LLC, and two life-insurance policies. We address each in turn.

### 1. Applicable Law

In Texas, property owned before marriage—or acquired during marriage by gift, devise, or descent—is separate property and remains the spouse's separate property during and after the marriage. Tex. Const. art. XVI, § 15; Tex. Fam. Code Ann. § 3.001. A trial court has no discretion to divest a party of his or her separate property via a divorce decree. *Alcedo v. Alcedo*, No. 02-17-00451-CV, 2019 WL 2292979, at *3 (Tex. App.—Fort Worth May 30, 2019, pet. denied) (mem. op.).

But as a starting point for a property division, "[p]roperty possessed by either spouse during or on dissolution of marriage is presumed to be community property."

18

Tex. Fam. Code Ann. § 3.003(a). A party claiming certain property as separate must rebut the community-property presumption with clear and convincing evidence. *Pearson v. Fillingim*, 332 S.W.3d 361, 363 (Tex. 2011); Tex. Fam. Code Ann. § 3.003(b). Generally, one spouse's uncorroborated testimony is not sufficient to meet this burden. *See Boyd*, 131 S.W.3d at 614 (rejecting proposition that "uncorroborated, uncontradicted testimony of a spouse is per se sufficient to clearly and convincingly prove the separate character of property"); *Newland v. Newland*, 529 S.W.2d 105, 107–08 (Tex. App.—Fort Worth 1975, writ dism'd) (citing instances in which uncorroborated testimony would suffice because no other evidence exists).

We determine whether property is separate or community by its character at the time of inception. *Boyd*, 131 S.W.3d at 612. "Inception of title occurs when a party first has a right of claim to the property by virtue of which title is finally vested." *Id.* The spouse claiming certain property as separate must trace and clearly identify the property. *Id.* (citing *Est. of Hanau v. Hanau*, 730 S.W.2d 663, 667 (Tex. 1987)). Tracing involves establishing the property's separate origin through evidence showing the time and means by which the spouse originally obtained possession of the property. *Id.* Generally, "mere testimony that property was purchased with separate funds, without any tracing of the funds, is insufficient to rebut the community presumption." *Id.*

"Separate property will retain its character through a series of exchanges so long as the party asserting separate ownership can overcome the presumption of community property by tracing the assets on hand during the marriage back to property that,

19

because of its time and manner of acquisition, is separate in character." *Id.* (citing *Cockerham v. Cockerham*, 527 S.W.2d 162, 168 (Tex. 1975)). When evidence establishes that a spouse's title to property originated before the marriage, making the property that spouse's separate property, the community-property presumption "no longer prevails." *Galindo v. Galindo*, No. 02-22-00472-CV, 2023 WL 4630673, at *3 (Tex. App.—Fort Worth July 20, 2023, no pet. h.) (mem. op.) (quoting *Welder v. Lambert*, 44 S.W. 281, 287 (Tex. 1898)). If one spouse improves his or her separate property with community funds, then the other spouse would be entitled to reimbursement to the community estate out of the separate, improved estate. *Id.* (citing *Dakan v. Dakan*, 83 S.W.2d 620, 627 (Tex. 1935)). The equitable claim for reimbursement, however, "is not a right, title, or interest in the land as such." *Id.* (quoting *Dakan*, 83 S.W.2d at 628). And a spouse's separate property does not change to community property merely because it was improved with community funds. *Id.*

### 2. The Marital Residence

The parties do not dispute that the marital residence was purchased in 2015, before the parties married in 2016. The record reflects that Ron was the only grantee on the deed and the only borrower on the loan application. Thus, under the inception-of-title rule, the marital residence was Ron's separate property. *See Boyd*, 131 S.W.3d at 612.

As evidence that the marital residence became community property, Kelly cites a 2017 mortgage refinance in which Ron identified the residence as community property

and listed the parties' joint checking account as a source of down payment. She further cites her testimony that the mortgage company for the refinance led her to believe that she would be on the deed. Using community funds to refinance the mortgage, however, would not transform the marital residence from separate to community property. *See Galindo*, 2023 WL 4630673, at *3. Rather, there must be some evidence that Ron made a gift by executing a deed. *See id.* at *4 n.7; *Ryan v. Ryan*, No. 02-22-00471-CV, 2023 WL 4007393, at *3 (Tex. App.—Fort Worth June 15, 2023, no pet.) (mem. op.).

Copies of the loan application, note, and lien for the 2017 refinance were admitted at trial. The lien identifies both Kelly and Ron as borrowers but includes a provision limiting liability for the mortgage to those borrowers who signed both the lien and note. The loan application and note list only one borrower: Ron.

Kelly contends that the facts at issue here are like those in *In re Marriage of Nash*, in which the court held that a deed to only one spouse is insufficient to overcome the community-property presumption. 644 S.W.3d 683, 702 (Tex. App.—Texarkana 2022, no pet.). *Nash* is inapplicable, however, because the property at issue there was purchased during marriage, and no evidence showed that the bank had agreed to hold only the one spouse's separate property liable for the note. *Id.*

The evidentiary record here does not reflect that Ron executed a deed during the 2017 refinance to transfer ownership of the marital residence to Kelly or the community estate. Thus, the evidence sufficed to support the trial court's determination that the marital residence was Ron's separate property.

21

### 3. Shareholder Interests in RCP Fund I, LLC

Ron testified at trial that he worked for Suntex Marina Investors and that Suntex issued him 1,500 "Class B units" of stock on July 31, 2015. Documents that Ron purportedly received from Suntex were admitted into evidence. Kelly did not object. Citing the documents, Ron testified that the "Class B units" would be converted to "Class A units" under certain circumstances. One of the documents is a letter purportedly from Suntex's chief financial officer indicating that Ron received the 1,500 Class B units on July 31, 2015, as part of Suntex's acquisition of another company. Another document is a letter from the same person indicating that the "Suntex recapitalization transaction" had completed and that Ron's stock would roll over to 33,051 Class A units. Ron testified that he cashed out a portion and rolled over 33,000 units.

Ron also offered Capital Account Statements and a subscription agreement purportedly from Resilient Capital Partners (RCP). Kelly again did not object, and the trial court admitted the documents. The subscription agreement states that RCP Fund I, LLC (RCP Fund) was "seeking capital contributions . . . of membership interests in Suntex Marina Investors LLC . . . in exchange for the issuance of limited liability company interests in [RCP Fund I, LLC]." Ron testified that the RCP documents reflected that the Suntex Class B units eventually became shares of RCP Fund. Specifically, Ron pointed to the following language in the subscription agreement:

**Amount of Capital Contribution:**
Suntex Units: <u>$558,262.18</u>
Rollover Percentage: <u>100%</u>

Kelly offered no contrary evidence.

On appeal, Kelly contends that the unauthenticated letter from Suntex's chief financial officer "contain[ed] hearsay statement[s] by a non-testifying party" and was "at best cumulative testimony." But because Kelly did not object to any of Ron's evidence at trial, she failed to preserve these complaints for appeal. *See* Tex. R. App. P. 33.1(a)(1)(A); Tex. R. Evid. 103(a)(1).

Citing *Parmeter v. Parmeter*, 348 S.W.2d 51, 54 (Tex. App.—Dallas 1961, no writ), Kelly contends that with the letter excluded, Ron's "testimony alone is insufficient to rebut the [community-property] presumption." In *Parmeter*, one spouse testified that neither the community nor the other spouse had equity in an airplane purchased during the marriage because the asset had depreciated. *Id.* The spouse offered "no figures as to values or depreciation." *Id.* The court concluded that such a general statement by an interested party could do no more than raise a fact issue and so was not conclusive proof that there was no community property. *Id.*

Although we agree with this proposition, *Parmeter* doesn't apply here. Unlike the general testimony in *Parmeter*, Ron testified specifically about when and how he acquired the Class B units and how they were converted to shares of RCP Fund. And unlike the unsupported testimony in *Parmeter*, Ron offered corroborating documentary evidence. Ron's testimony and evidence trace the RCP Fund shares to Suntex Class B units that

23

he received before the marriage. We conclude that sufficient evidence supports the trial court's determination that the RCP Fund shares were Ron's separate property. *See Boyd*, 131 S.W.3d at 612.

### 4. Life-Insurance Policies

At trial, Ron introduced documents reflecting the details of two universal life-insurance policies. Kelly did not object, and the trial court admitted them. Ron testified that the policies were issued on May 22, 1999, and June 14, 2001. The documents corroborated his testimony.

Kelly does not contest that the policies were Ron's separate property under the inception-of-title rule. Instead, she contends that the policies increased in value with each premium payment, that any property division should have accounted for payment from community funds, and that Ron failed to offer evidence on this issue. But using community funds to pay the premiums and increase the policies' value would not change their character from separate to community property; at most, a reimbursement claim would arise. *See Galindo*, 2023 WL 4630673, at *3. Thus, the evidence sufficed to support the trial court's determination that the life-insurance policies were Ron's separate property under the inception-of-title rule. *See Boyd*, 131 S.W.3d at 612.

Having concluded that the record reflects sufficient evidence to support the trial court's determination that the marital residence, the RCP Fund stock, and the life-insurance policies were Ron's separate property, we overrule Kelly's fourth issue.

24

## C. Kelly's Reimbursement Claim

In her fifth issue, Kelly contends the trial court abused its discretion when it determined that she had waived her reimbursement claim because the claim was tried by consent. Ron contends that the trial court did not in fact find any waiver because he had stipulated to the reimbursement, which the trial court properly calculated.

As previously noted, a spouse is entitled to reimbursement to the community estate from the other spouse's separate estate that has been improved with community funds. *Galindo*, 2023 WL 4630673, at *3. The spouse seeking reimbursement has the burden to plead and prove reimbursable expenditures. *McCoy v. McCoy*, No. 02-15-00208-CV, 2016 WL 3659122, at *2 (Tex. App.—Fort Worth July 7, 2016, no pet.) (mem. op.) (citing *Vallone v. Vallone*, 644 S.W.2d 455, 459 (Tex. 1982)). A trial court's discretion in evaluating a reimbursement claim is as broad as that exercised when making a just and right division of the community estate. *Id.*

The parties do not dispute that Kelly had the burden to plead a reimbursement claim and failed to do so. Nonetheless, Ron stipulated to a reimbursement and included it in his proposed property division, which was admitted at trial. Ron testified that he owed about $656,000 on the mortgage for the marital residence and that almost $64,000 had been paid down since the 2017 refinance. Ron's verified amended inventory and appraisement, admitted at trial, reflects a mortgage balance of $667,727.19. Ron's proposed property division reflects a $63,728.81 paydown. Kelly offered no evidence to contradict the values in Ron's proposed property division, but

25

she did inform the court that the parties had been paying $3,468 per month on the mortgage.

As to Ron's life-insurance policies, the trial court asked whether Ron had a breakdown of the increase in the policies' cash value. Ron responded that it was Kelly's burden to prove the increased value and that he did not have a breakdown. Kelly offered no evidence on this question. And the record does not show that either party considered the RCP Fund stock as part of any reimbursement claim. The trial court's final decree includes an award to Kelly for $43,153 that represents her portion of community funds used to pay down the mortgage on the marital residence.

After closing arguments, the trial court rendered an oral ruling that included its reimbursement-claim calculation. The trial court noted that Ron "could have just sat back and said 'it's your burden to prove [the reimbursement claim], Ma'am,' but [he] didn't[,] to [his] credit. So I'm finding [he is] correct." The trial court found that no evidence was offered to prove a reimbursement claim on the life-insurance policies or the RCP Fund stock. Finding that Ron's proposed property division was the only evidence offered to show the value of the assets at issue in the property division, the trial court listed the items included in the community estate and set the value at $116,366.99.

The trial court awarded Kelly 70% and Ron 30% of the community estate. To arrive at the reimbursement value for the marital residence, the trial court subtracted from Ron's 30% share the value of four specific items it was awarding to Ron from the

26

community estate: a golf cart, a bank account, a health savings account, and an IRA. The remaining $20,575 was Ron's share of the equity in the marital residence. Subtracting this from the $63,728.81 paydown reflected on Ron's proposed property division, the trial court determined that Kelly would receive "[$]43,153 out of the home equity." The trial court's final decree reflects this same division, and the trial court's findings of fact are consistent with its oral pronouncement. Although we may not treat the trial court's oral statements as findings of fact, *see Seasha Pools, Inc. v. Hardister*, 391 S.W.3d 635, 640 (Tex. App.—Austin 2012, no pet.), they do reflect the trial court's reasoning. Because the record reflects that the trial court did not find that Kelly had waived the reimbursement claim, we overrule her fifth issue.

**D. Findings of Fact and Conclusions of Law**

In her first issue, Kelly contends that the trial court erred by not making "specific asset findings" when she requested them. According to Kelly, she requested findings of fact and conclusions of law on "several issues related to [the] characterization and value of the marital assets." She complains that the trial court's findings "just state generally the amount the court found as reimbursement . . . but not the methodology or calculation on how it reached that conclusion." In her second issue, Kelly contends that the trial court erred by not making "specific 'best interest of the child' findings" when she requested them. According to Kelly, the trial court's findings are "wholly inadequate" to explain why it deviated from the standard possession order.

27

In both issues, Kelly contends that the trial court's failure to file adequate findings of fact and conclusions of law left her "guessing the reasons for the trial court's decision[s]." Thus, she contends that we should reverse the trial court's property distribution and possession order and remand for a new trial.

The record reflects that Kelly timely requested findings of fact and conclusions of law under Texas Rule of Civil Procedure 296. *See* Tex. R. Civ. P. 296 (permitting any party to request findings and conclusions in a case tried without a jury). When the trial court did not file its findings and conclusions, Kelly timely filed a notice of late filing under Rule 297. *See* Tex. R. Civ. P. 297 (providing requirements for filing a notice of past due findings and conclusions). The trial court filed its findings and conclusions, and Kelly timely filed a request for additional and amended findings and conclusions under Rule 298. *See* Tex. R. Civ. P. 298 (providing requirements of filing request for additional or amended findings and conclusions). The trial court filed supplemental findings and conclusions.

Under Rule 296, a trial court's failure to file findings of fact and conclusions of law is presumed reversible error, unless the record affirmatively shows that the requesting party was not harmed by their absence. *Tenery v. Tenery*, 932 S.W.2d 29, 30 (Tex. 1996). Error is harmless unless it prevents an appellant from properly presenting a case to the appellate court. *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014); *Tenery*, 932 S.W.2d at 30. Kelly does not explain how she was harmed by the trial court's failure to produce findings and conclusions beyond those

that it filed, and the record shows that she was not harmed. *See Graham Cent. Station*, 442 S.W.3d at 263. Indeed, Kelly was able to challenge the sufficiency of the evidence to support the trial court's determinations at issue, and we have addressed those challenges. Any error in failing to file additional findings and conclusions was harmless. *See id.* We overrule Kelly's first and second issues.

## IV. Conclusion

Having overruled all of Kelly's issues, we affirm the trial court's final divorce decree.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: August 31, 2023